1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| RICHARD EUGENE MADSEN, | Civil No. 04cv1726-IEG (BLM) |
| Petitioner, | **ORDER DENYING REQUEST FOR JUDICIAL NOTICE; AND** |
| v. | |
| JOE MCGRATH, Warden, | **REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| Respondent. | |

18    This Report and Recommendation is submitted to United States

19  District Judge Irma E. Gonzalez pursuant to 28 U.S.C. § 636(b) and

20  Local Civil Rules 72.1(d) and HC.2 of the United States District

21  Court for the Southern District of California.

22    On August 24, 2004, Petitioner Richard Eugene Madsen

23  ("Petitioner" or "Madsen"), a state prisoner appearing in *pro se*,

24  and *in forma pauperis,* commenced these habeas corpus proceedings

25  pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] He challenges his San

26  Diego Superior Court convictions in case number SF 118015 and

27  requests the Court take judicial notice of his original petition.

28  ///

1    This Court has considered the Petition ("Pet."), Respondents'

2    Answer, Madsen's Traverse, and all moving papers and supporting

3    documents submitted by the parties.  For the reasons set forth

4    below, this Court **DENIES** Madsen's request for judicial notice and

5    **RECOMMENDS** that Madsen's Petition for Writ of Habeas Corpus be

6    **DENIED**.

7    **FACTUAL AND PROCEDURAL BACKGROUND**

8    **A.    Madsen's Conviction and Sentence**

9    On January 21, 1998, Madsen was convicted of aggravated

10   mayhem (California Penal Code[1] § 205), assault by means of force

11   likely to produce great bodily injury (§ 245(a)(1)), possession by

12   a prisoner of a sharp instrument (§ 4502) and making a terrorist

13   threat (§ 422). (Lodgment No. 1.)

14   The following facts are taken from the California Court of

15   Appeal's opinion on direct review in <u>People v. Madsen</u>, No. D033707,

16   slip op. (Cal. Ct. App. November 28, 2000).  (Lodgment No. 3.)  This

17   Court presumes the state court's factual determinations to be

18   correct absent clear and convincing evidence to the contrary. 28

19   U.S.C. § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340

20   (2003); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992) (holding

21   findings of historical fact, including inferences properly drawn

22   from such facts, are entitled to statutory presumption of

23   correctness).

24       On April 24, 1997, Madsen was a prisoner in
         Module 5B, the administrative segregation unit of
25       George Bailey Detention Center in San Diego housing
         prisoners separated from the general prison population
26       because they are dangerous or need special protection.
         Dangerous or "high-powered" prisoners are housed in 18

27

---

28   [1]All further statutory references are to the California Penal Code unless
     otherwise specified.

cells on the lower level of Module 5B and protective custody prisoners are housed in 18 cells on the upper level of Module 5B; the two levels are connected by stairways.  Prisoners are allowed out of their cells and into the dayroom in small groups for one hour each day.  Madsen was a dangerous prisoner who was housed in the lower level of Module 5B.

On the morning of April 24 Madsen was in the dayroom with inmates Edward Bergman, Gilberto Espinoza and Joseph Cornejo.  Toward the end of their hour, a correctional officer observed Cornejo standing by the telephones in the dayroom, bleeding profusely from his face.  At that time the officer saw Madsen and the other two inmates in the upstairs shower area.  The officer thought that was unusual because there were only two shower heads and inmates in Module 5B rarely shower together.

The officer sounded a lockdown order.  Madsen, Bergman and Espinoza were slow in returning to their cells, continuing with their showers for several minutes despite repeated lockdown commands.  The officer took Cornejo to the medical station and he was thereafter flown to a hospital.  Cornejo suffered three slashing wounds to his face; two on his right side went from his ear to his mouth and the one on his left side went from his cheekbone to his nose.

Madsen had a scratch and bruise on his upper left thigh; Espinoza had a cut on his ring finger; and Bergman had no injuries.  After all three had returned to their respective cells, another correctional officer attempted to monitor their conversations by using cell intercoms, but he could not hear anything because of noise caused by toilets flushing.[2]

Two unaltered razors were found hidden in Madsen's mattress and a set of wet jail clothing was hanging on a makeshift drying line.  Inmates were not permitted to have extra sets of clothing, rope, or razors except when shaving.

On April 24 Victor Solano, a protective custody inmate in Module 5B, requested to go to the dispensary for medical treatment for a sports injury.  Solano was taken to the dispensary by a correctional officer. Solano then handed the officer a "kite", or jailhouse letter, together with a newspaper article on the Cornejo incident, and told the officer to read the letter.  The letter was written by Madsen.  The letter stated:

_____

[2]  Inmates often flush their toilets when they do not want their conversations to be overheard.

"MARK, DESTROY THIS AFTER READING.  FIRE IS COMING.  HANG ON - - THIS PIECE OF SHIT GOT WHACKED UP- - FOR - - WELL, NEVER MIND THAT. (IT'S BIZ.) ANYWAY- - THEY TOOK ALL MY SHIT DAGO DAWG!  I NEED SOME SHOES BROTHER.  YES I DID HIM - - FUCKEN PUNK PIECE OF SHIT!  SEND BACK ARTICAL [sic].  IT'S OUT OF TODAY['']S PAPER - - I WANT IT[.]  DO NOT MENTION THIS TO ANYONE MARK - - THAT'S AN ORDER DAWG - - CAUSE NO ONE KNOWS WHAT HAPPENED.  GET ME SOME SHOES DAWG. NICE ONES.  I GOT IT COMING - - W/R[.]"

On June 2 a razor blade, apparently removed from a disposable razor, was found hidden in the spine of a legal pad in Madsen's cell.  The legal pad bore Madsen's handwriting and was inside an accordion folder with other legal pads and papers that belonged to Madsen.[3]

On June 23 Madsen was housed in the downtown San Diego jail in tank 4B, which holds "high-powered" prisoners.  San Diego County Sheriff Michael Bradburn was working as a guard that day and at about 7 a.m. Madsen became angry when Bradburn refused his request to postpone Madsen's shower time until later in the day.  Madsen threatened to kill Bradburn and said he could get Bradburn when he was released or he could have someone else "whack" him.  Another deputy relieved Bradburn later that day and told Madsen that Bradburn filed a felony report on the incident. Madsen told the other deputy he wanted to apologize to Bradburn and "squash" the matter, and that the incident was his mistake.

An information charged Madsen with four offenses listed *ante*, and alleged that in committing the charged assault he caused great bodily injury (§§ 12022.7 subd. (a), 1192.7, subd. (c)(8)) and personally used a deadly weapon (§ 1192.7, subd. (c)(23)).[4]  It also alleged Madsen had five no-probation prior convictions (§ 1203, subd. (e)(4)), two prison prior convictions (§ 667.5, subd. (b)), two serious felony prior convictions (§ 667, subd. (a)), and two prior strike convictions (§§ 667, subds. (b)-(I), 1170.12).

At Madsen's trial, Solano testified that a few days before the Cornejo incident he took a jailhouse shank, consisting of a razor blade melted into a pen shaft, from Espinoza's cell and delivered it to

---

[3] Before trial the razor blade was lost and another one was substituted for illustration purposes.

[4] Effective as of January 1, 2000, former section 1192.7, subdivision (c)(23) was renumbered as section 1192.7, subdivision (c)(24). (Stats. 1999. ch. 298, § 1, p. 2039.)

Madsen's cell.  Two days before the incident, he heard Madsen tell Espinoza that he was going to "get that piece of shit," referring to Cornejo.  At the time of the Cornejo incident, Solano was locked in his upstairs cell in Module 5B.  Solano looked out through the food tray slot in his door and had a limited view of Module 5B, but could not see Cornejo's cell downstairs.  He saw Madsen, Bergman, Espinoza and Cornejo in the dayroom.  Madsen and Bergman were playing chess and Espinoza was sitting at a table.  Cornejo was talking on the telephone.  Cornejo hung up the telephone and walked toward his cell, out of Solano's view.  Madsen and Bergman then walked toward Cornejo's cell, followed by Espinoza.  About ten minutes later, Solano saw Bergman walk up the stairs to the shower area.  Madsen walked up another set of stairs to the shower area.  Madsen was not wearing a shirt and had red marks on his chest as if someone had pushed him.  Madsen appeared agitated.  Madsen removed his clothes as he approached the shower area.  Madsen and Bergman started showering.  A few minutes later, Solano saw Cornejo reappear by the telephone area, bleeding heavily from his face.  Espinoza then arrived at the shower area and told the others he wanted to shower.  Bergman got out and Espinoza began showering.  Madsen and Espinoza whispered to each other.

Solano testified that two days after the incident Madsen came to his cell and asked him if he remembered how he and Solano were watching television when Cornejo attempted suicide.  Madsen told Solano he wanted him to testify how he and Solano saw Cornejo come out bleeding.  Madsen stated that Cornejo was a "piece of shit" and got what he had coming.  Madsen gave Solano the "kite" with the newspaper article and asked him to give it to an inmate named Mark, who was in Module 5A.

Investigator Efrain Garcia testified that when inmates want to shave, they are issued disposable razors in their cells.  Inmates are required to return them and a log is maintained showing the issuance and return of razors to inmates.  However, sometimes inmates will claim the razors were accidentally flushed down toilets and resulting searches of their cells fail to produce the missing razors.  Inmates transfer razors or their blades to other cells pending completion of searches and then they are returned to the inmates' cells.

Bradburn testified that Madsen's threat to kill him frightened him because Madsen was a "high-powered" inmate who was housed in the unit with the most violent inmates.  Bradburn knew Madsen previously had been in the special housing unit of the Pelican Bay

prison in which its most dangerous inmates are housed, kept in solitary confinement, and escorted in chains by guards who wear protective gear.  Bradburn also knew that Madsen was in a violent prison gang, from which he inferred Madsen could have someone else in the gang kill him.[5]

In his defense, Madsen presented the testimony of San Diego County Sheriff Department's criminalist that a very small amount of blood was found on Espinoza's and Bergman's clothing, and none was found on Madsen's clothing.  On cross-examination, the criminalist admitted fresh blood can be washed off clothing in a shower.

Bergman testified that on April 24, 1997, he and Madsen played chess in the dayroom and then went to take showers.  While they were in the shower area, they saw Cornejo bleeding, then saw Espinoza walk up the stairs.  On cross-examination, Bergman admitted it would be to his advantage in prison if other prisoners learned he had testified favorably for Madsen.

Prison inmate Dennis Sukon testified that he loaned Madsen his legal pad, forgetting he had hidden a razor blade in it.  On cross-examination, Sukon admitted he was serving a term of life without the possibility for parole and could suffer no further punishment were he prosecuted for possessing the razor blade.  He also admitted that during his own criminal trial he sent his codefendent notes instructing her to lie when testifying.

Prison inmates James Speck and Richard Riddle testified that they heard the June 23, 1997, discussion between Madsen and Bradburn.  They testified that Madsen never threatened Bradburn.

The jury found Madsen guilty of the four charged offenses and found the enhancement allegations true.  A bifurcated trial was then conducted on the allegations of Madsen's prior convictions and the jury found the allegations true.

Madsen filed a motion for a new trial on various grounds, including juror misconduct and ineffective assistance of counsel.  The trial court denied the motion.

The trial court sentenced Madsen pursuant to the three strikes law to consecutive terms of 25 years to life for each of counts two, three and four (§§ 245,

---

[5] The gang was not identified for the jury at trial, but apparently was the Aryan Brotherhood.

subd.(a)(1), 4502, 422) and stayed pursuant to section 654 a term of 25 years to life for count one (§ 205). The court imposed enhancements of three years for infliction of great bodily injury (§ 12022.7, subd. (a)) and five years for each of the two serious felony prior convictions (§ 667, subd. (a)(1)).  The trial court therefore imposed an aggregate term of 88 years to life.

(Lodgment No. 3.[6])

**B.    Direct Appeal**

Madsen appealed to the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment No. 2.)  In an unpublished opinion filed on November 28, 2000, the California Court of Appeal affirmed the conviction in all respects except for a juror misconduct issue, which it remanded to the trial court for factual findings. (Lodgment No. 3.)  Madsen then filed two successive petitions for review raising different issues in the California Supreme Court (Lodgment Nos. 6, 8), which were summarily denied without citation of authority on January 17, 2001 and March 14, 2001 respectively (Lodgment Nos. 7, 9).

On remand, the trial court made the requested findings and on March 21, 2002, reinstated the earlier judgment.  (Lodgment No. 4.) Madsen appealed this decision to the California Court of Appeal, which denied the petition on November 7, 2003. (Lodgment No. 5.) Madsen did not seek California Supreme Court review.

///

///

///

---

[6]For purposes of clarity, Counts 1 and 2 concern the April 24, 1997 attack on Cornejo; Count 3 concerns the June 2, 1997 discovery of a razor blade in a legal pad in Madsen's cell; and Count 4 concerns the June 23, 1997 threat against Deputy Michael Bradburn.

C.        **Collateral Review**

On August 26, 2004, Madsen filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] Respondent moved to dismiss the federal habeas petition on November 3, 2004. [Doc. No. 12.]

On December 2, 2004, Madsen filed a habeas corpus petition in the California Supreme Court (Lodgment No. 11), which was denied without citation of authority on January 4, 2006 (Lodgment No. 16).

On June 29, 2005, this Court dismissed the petition with leave to amend stating that the petition did not comply with Rule 8(a) of the Federal Rules of Civil Procedure because it did not present a short and plain statement of the case. [Doc. No. 36.] On September 2, 2005, Madsen filed a First Amended Petition which purported to incorporate the original Petition by a request for judicial notice. [Doc. No. 46.] On March 21, 2006, Respondent filed a motion to dismiss, which was denied on August 8, 2006, at which time Respondent was ordered to file an Answer. [Doc. No. 80, 88.]

On December 29, 2006, Respondent filed a motion to dismiss for failure to exhaust which was summarily stricken on February 6, 2007 because the Court already had ordered Respondent to answer the Petition. [Doc. No. 93.] On March 16, 2007, Respondent filed an Answer. [Doc. No. 97.] On June 26, 2007, Madsen filed his Traverse and the Court took the matter under submission.

///

///

///

///

///

1        **STANDARD OF REVIEW**

2        Title 28 of the United States Code, section 2254(a), sets

3    forth the following scope of review for federal habeas corpus

4    claims:

5            The Supreme Court, a Justice thereof, a circuit
         judge, or a district court shall entertain an appli-
6        cation for a writ of habeas corpus in behalf of a
         person in custody pursuant to the judgment of a State
7        court only on the ground that he is in custody in
         violation of the Constitution or laws or treaties of
8        the United States.

9    28 U.S.C. § 2254(a).

10       The Petition was filed after enactment of the Anti-terrorism

11   and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-

12   132, 110 Stat. 1214.   Under 28 U.S.C. § 2254(d), as amended by

13   AEDPA:

14           (d)  An application for a writ of habeas corpus on
         behalf of a person in custody pursuant to the
15       judgment of a State court shall not be granted with
         respect to any claim that was adjudicated on the
16       merits in State court proceedings unless the
         adjudication of the claim—

17           (1)  resulted in a decision that was contrary
18       to, or involved an unreasonable application of,
         clearly established Federal law, as determined by the
19       Supreme Court of the United States; or

20           (2)  resulted in a decision that was based on an
         unreasonable determination of the facts in light of
21       the evidence presented in the State court proceeding.

22   28 U.S.C. § 2254(d).   Summary denials do constitute adjudications on

23   the merits.   See Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002).

24   Where there is no reasoned decision from the state's highest court,

25   the Court "looks through" to the underlying appellate court

26   decision.   Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

27       A state court's decision is "contrary to" clearly established

28   federal law if the state court: (1) "arrives at a conclusion

1   opposite to that reached" by the Supreme Court on a question of law;

2   or (2) "confronts facts that are materially indistinguishable from

3   a relevant Supreme Court precedent and arrives at a result opposite

4   to [the Supreme Court's]." Williams v. Taylor, 529 U.S. 362, 405

5   (2000).

6        A state court's decision is an "unreasonable application" of

7   clearly established federal law where the state court "identifies

8   the correct governing legal principle from this Court's decisions

9   but unreasonably applies that principle to the facts of the

10  prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).

11  "[A] federal habeas court may not issue a writ simply because the

12  court concludes in its independent judgment that the relevant state-

13  court decision applied clearly established federal law erroneously

14  or incorrectly . . . . Rather, that application must be *objectively*

15  *unreasonable*." Andrade, 538 U.S. at 75-76 (emphasis added)

16  (internal quotation marks and citations omitted). Clearly

17  established federal law "refers to the holdings, as opposed to the

18  dicta, of [the United States Supreme] Court's decisions." Williams,

19  529 U.S. at 412.

20        Finally, habeas relief is also available if the state court's

21  adjudication of a claim "resulted in a decision that was based on an

22  unreasonable determination of the facts in light of the evidence

23  presented in state court." 28 U.S.C. § 2254(d)(2). A state court's

24  decision will not be overturned on factual grounds unless this Court

25  finds that the state court's factual determinations were objectively

26  unreasonable in light of the evidence presented in the state court

27  proceeding. See Miller-El, 537 U.S. at 340. This Court will

28  presume that the state court's factual findings are correct, and

1   Madsen may overcome that presumption only by clear and convincing

2   evidence.  28 U.S.C. § 2254(e)(1).

3                              **DISCUSSION**

4        Madsen presents fourteen grounds for habeas relief including

5   ineffective assistance of counsel, due process, and violations of

6   his right to a fair trial.[7]  (Pet. at 1-97.)

7        Respondent counters that the Petition should be dismissed

8   because Petitioner has not exhausted his state remedies with respect

9   to all of the claims contained in the First Amended Petition, and in

10  any event, the state court's decision rejecting his claims on the

11  merits was not objectively unreasonable. (Answer at 10-13.)

12  **A.    Judicial Notice**

13       Madsen requests the Court take judicial notice of his

14  original petition and lodgments. (Pet. at 31.)

15       Under Federal Rules of Evidence 201, the Court may take

16  judicial notice only of an adjudicative fact, i.e. a "fact which is

17  not subject to reasonable dispute in that it is either (1) generally

18  known within the territorial jurisdiction of the trial court or

19  (2)capable of accurate and ready determination by resort to sources

20  whose accuracy cannot reasonably be questioned." Fed. R. Evid.

21  201(b). Further, an amended pleading must be complete in itself

22  without reference to the superseded pleading and shall contain

23  copies of all exhibits referred to in such amended pleading.  S.D.

24  Cal. Civ. R. 15.1.

25       Here, Madsen wants to incorporate his original petition into

26  his amended petition via his request for judicial notice.  The Court

27  ────────────────

        [7]The Court notes that Madsen did not number the pages of his Petition
28  consecutively. For ease of reference, the Court has inserted numerical page
    numbers in the Petition to which it will refer.

                                    -11-                    04cv1726 IEG (BLM)

1    dismissed the original petition because it was over 600 pages long,

2    presented approximately 246 claims, and was largely unintelligible.

3    [Doc. No. 36.] By its very nature, the original petition cannot be

4    considered an adjudicative fact as contemplated by Rule 201(b)

5    because it is a pleading advocating Madsen's position, and therefore

6    is subject to dispute.  The Court cannot appropriately take judicial

7    notice of it for this reason.  See F.R.Ev. 201(b).  Morever,

8    incorporating the original petition into the amended petition would

9    violate Local Rule 15.1's prohibition requiring an amended pleading

10   be complete in itself.  Accordingly, the Court **DENIES** Madsen's

11   request for judicial notice.

12   **B.       Exhaustion**

13         Respondent argues that the Court should dismiss the Petition

14   because Madsen has "raised a number of claims in federal court that

15   he did not raise in state court." (Answer at 11.)  Petitioner

16   counters that he has fully exhausted all his claims. (Pet. at 7, 13,

17   22, 31, 44, 50, 57, 62, 70, 74, 77, 89, 93.)

18         The exhaustion of available state judicial remedies is a

19   prerequisite to a federal court's granting of claims presented in

20   habeas corpus proceedings.  28 U.S.C. § 2254(b); see Rose v. Lundy,

21   455 U.S. 509, 522 (1982); McQueary v. Blodgett, 924 F.2d 829, 833

22   (9th Cir. 1991).  For exhaustion purposes, Petitioner must have

23   "fairly presented" his federal claims to the highest state court

24   with jurisdiction to consider them. See Rose v. Lundy, 518-21

25   (1982); Picard v. Connor, 404 U.S. 270, 275 (1971). However, the

26   Court may deny the petition even if it contains unexhausted claims

27   if it is "perfectly clear" that the claims are meritless. Granberry

28   v. Greer, 481 U.S. 129, 135 (1987); Cassett v. Stewart, 406 F.3d

1  614, 623-624 (9th Cir. 2005).

2      A thorough comparison of the current Petition and the

3  Petition for Habeas Corpus submitted to the California Supreme Court

4  indicates that Petitioner has exhausted many of the claims

5  Respondent asserts are unexhausted.   For example, Respondent

6  contends that within Claim 3, Madsen asserts a due process violation

7  based upon an improper joinder of counts which he failed to present

8  to a state court.  (Answer at 11.)  However, on page 131 of Madsen's

9  California Supreme Court habeas corpus petition, he claims that "the

10  impermissible joinder denied him due process and a fundamentally

11  fair trial in violation of his 14th Amendment Right as guaranteed by

12  the United States Constitution."  (Lodgment No. 11 at 131.)

13      Similarly, Respondent argues that in Claim 9, Madsen asserted

14  a due process violation claiming the prosecutor went beyond the

15  allowable limits imposed by the court on gang evidence when he

16  "elicited testimony that in prison it's a game in the gang, and that

17  'Mainline is out there play [sic] gang games'"(Pet. at 16i.) which

18  he also failed to present to a state court.  (Answer at 11.)  On the

19  contrary, at page 19 of his California Supreme Court habeas corpus

20  petition, Madsen claims that the prosecutor improperly elicited

21  testimony from witness Solano who stated that "it is a game in the

22  gang that you've got to follow orders or you are weak and if you are

23  weak you pay the price. . Mainline is out there playing gang games.

24  . ." (Lodgment No. 11 at 19.)

25      However, even if Petitioner has presented some unexhausted

26  claims in his Petition, "[a]n application for a writ of habeas

27  corpus may be denied on the merits, notwithstanding the failure of

28  the applicant to exhaust the remedies available in the courts of the

1  State." 28 U.S.C. § 2254(b)(2).  For the reasons discussed below,

2  the Court **RECOMMENDS DENIAL** of Madsen's claims on the merits, and

3  therefore it is immaterial whether he has demonstrated complete

4  exhaustion of all claims.  <u>Cassett</u>, 406 F.3d at 623-624.

5  **C.**    **Right to Counsel**

6         Madsen makes multiple claims that his Sixth Amendment right

7  to counsel was violated by the trial court.  In Ground 1, Madsen

8  argues his Sixth Amendment right to counsel was violated when the

9  trial court denied his motion to appoint new counsel.  (Pet. at 7.)

10  In Ground 5, Madsen contends that his right to counsel was violated

11  when the trial court failed to conduct an adequate inquiry regarding

12  his complaints about his attorney in his <u>Marsden</u> and other hearings

13  during trial.  (<u>Id</u>. at 41.)

14         Respondent counters that Ground 1 should be denied because

15  Madsen waited until the eve of trial to request substitution of

16  counsel which would have required a continuance of the trial to

17  allow new counsel to prepare. (Answer at 14.) The continuance would

18  have inconvenienced witnesses and prejudiced the prosecution.  (<u>Id</u>.

19  at 14.)  Respondent contends that both the United States Supreme

20  Court and the Ninth Circuit give broad discretion to trial courts to

21  deny continuances. (<u>Id</u>.)  Respondent argues that Ground 5 should be

22  denied because the court did conduct a <u>Marsden</u> hearing and Madsen

23  did not demonstrate that he and counsel had suffered a fatal

24  breakdown in communication.  (<u>Id</u>. at 29-31.)  Therefore Respondent

25  argues the state court's denial of these claims was not contrary to,

26  or an unreasonable application of, clearly established United States

27  Supreme Court law.

28  ///

**Appointment of Counsel**

In evaluating the merits of Ground 1, this Court must look through to the last reasoned state court decision.  See Ylst, 501 U.S. at 801-806.  Here, because the California Supreme Court summarily denied Madsen's petition (Lodgment No. 16), the last reasoned state court decision came from the California Court of Appeal.  (Lodgment No. 3.)

The Court of Appeal rejected Madsen's claim on the following grounds:

B

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.[Citations]'[Citation.] (*People v. Courts*, (1985) 37 Cal.3d 784, 789.)  However, the right to appear and defend with retained counsel "is not absolute, and the court may exercise discretion to ensure orderly and expeditious judicial administration if the defendant is 'unjustifiably dilatory or . . . arbitrarily desires to substitute counsel at the time of trial.' [Citation.] (*People v. Leonard*, (2000) 78 Cal.App.4th 776, 784.)  "Generally the trial court has discretion whether to grant a continuance to permit a defendant to be represented by retained counsel. [Citation.]" (*People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.)  "Where a continuance is requested on the day of the trial, the lateness of the request may be a significant factor justifying denial absent compelling circumstances to the contrary. [Citation.]" (*Ibid.*)  It is the defendant's burden on appeal to show that the trial court abused its discretion by denying a motion to substitute counsel and continue the trial. (*Ibid.*)

C

In this case counsel was appointed for Madsen on or before his arraignment on August 12, 1997.  He was represented by his appointed counsel, Thomas Ulovec, at the preliminary examination on September 10.  Madsen's original trial date was set for November 13.  That trial date was later continued until January 12, 1998.  It was not until the last court day before the continued trial date that Madsen moved to substitute counsel and continue the trial.  Madsen's delay in moving to substitute counsel until that late date apparently was caused by his parents' delay in

agreeing to pay for retained counsel.

We conclude the trial court did not abuse its discretion by denying Madsen's substitution motion in the circumstances of this case. Madsen had at least four months during which he could have retained counsel before the continued January 12, 1998, trial date. He provides no explanation for that delay except that his parents apparently did not agree to pay for retained counsel until a few days before the trial date. Madsen was dilatory in obtaining retained counsel and his parents' apparent delay in assisting him to do so is an insufficient ground to excuse his dilatory conduct. Furthermore, the trial court acted within its discretion by finding the prosecution would be prejudiced by the 90-day or more continuance required for Madsen's retained counsel to prepare for trial. The record shows the prosecution had concerns regarding witness safety as shown by threats by Madsen and others against prosecution witnesses. Special arrangements were made to house one prosecution witness in protective custody. Other witnesses had been or were being transferred from other prisons to local facilities to testify at Madsen's trial. The trial court could reasonably find that it might prejudice the prosecution and interfere with orderly and expeditious administration of justice to continue the trial for at least 90 days so that Madsen's proposed substitute counsel could prepare for trial.

(Lodgment No. 3 at 10-11.)

As Respondent notes, there is no controlling United States Supreme Court authority on the discretion of a trial court to deny substitution of counsel where the substitution would require a delay, but the Supreme Court has held that trial courts generally have broad discretion in matters of continuances. U.S. v. Gonzalez-Lopez, ___ U.S.___, 126 S.Ct. 2557, 2566 (2006). "We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, Wheat v. U.S., 486 U.S. 153, 163-64 (1988), and against the demands of its calendar, Morris v. Slappy, 461 U.S. 1, 11-12,(1983)." Id.

///

1   Furthermore, the Ninth Circuit has held that trial courts
2   have wide discretion to deny substitution of counsel where the
3   substitution would require a delay. U.S. v. Prime, 431 F.3d 1147,
4   1155 (9th Cir. 2005); U.S. v. Garcia, 924 F.2d 925, 926 (9th Cir.
5   1991)(motion for appointment of counsel made six days before trial
6   was scheduled to begin was not timely because the quantity and
7   complexity of discovery would require a continuance).

8   Here, as the Court of Appeal stated, Madsen had at least four
9   months to retain counsel prior to his trial date and his proffered
10  reason for failing to procure representation is insufficient to
11  justify his dilatory conduct. The attorney Madsen wanted to
12  substitute, Nick De Pento, stated during the hearing that he was
13  hired by Mr. Madsen's father on the Tuesday before the case was set
14  to go to trial. (Supp. Lodgment No. 12 at 1.) After hearing from
15  the defense and prosecution regarding De Pento's need for time to
16  prepare, the date of the offenses, and the availability of
17  witnesses, the court determined that it was "clear that at this time
18  to grant [the] motion for 90 days would prejudice the people."
19  (Supp. Lodgment No. 12 at 3.) In light of the above, the Court of
20  Appeal's affirmance of the trial court's denial of substitution of
21  counsel was not contrary to, or an unreasonable application of,
22  clearly established United States Supreme Court law and therefore
23  the Court **RECOMMENDS** this claim be **DENIED**. See Prime, 431 F.3d at
24  1156 (denial of substitution of counsel on eve of trial not an abuse
25  of discretion).
26  ///
27  ///
28  ///

1 **<u>Failure to Conduct Adequate Marsden Hearings</u>**

2    Madsen claims in Ground 5 that he was denied his Sixth
3 Amendment right to counsel because the trial court failed to
4 sufficiently inquire about a breakdown in communication between
5 Madsen and his attorney. (Pet. at 41.) In addition, Madsen claims
6 the trial court failed to research charges that defense counsel had
7 a conflict of interest arising from counsel's prior representation
8 of percipient witness D.J. Bratton. (<u>Id</u>.) Madsen contends the
9 court failed to conduct an adequate <u>Marsden</u>[8] hearing regarding these
10 claims. (Id.)

11    Respondent counters that the claim should be denied because
12 Madsen had ample opportunity during trial to demonstrate that he and
13 trial counsel had experienced a breakdown in communication, or that
14 counsel had a conflict which impeded his representation, but Madsen
15 failed to show substitution of counsel was warranted despite these
16 opportunities. (Answer at 29-31.)

17    Madsen did not raise these issues on direct appeal, but
18 raised them in his habeas petition in the California Supreme Court,
19 which was silently denied. (Lodgment Nos. 9, 16.) Because the
20 state court did not furnish a basis for its reasoning, this Court
21 must conduct an independent review of the record to determine
22 whether the denial is contrary to, or an unreasonable application
23 of, clearly established Supreme Court law. <u>Himes v. Thompson</u>, 336
24 F.3d 848, 853 (9th Cir. 2003).

25    A state court's "summary denial of a defendant's motion for
26 new counsel without further inquiry violate[s] the Sixth Amendment."
27 <u>Hudson v. Rushen</u>, 686 F.2d 826, 829 (9th Cir. 1982); <u>Schell v.</u>

28    [8]<u>People v. Marsden</u>, 2 Cal.3d 118 (1970)

1   <u>Witek</u>, 218 F.3d 1017, 1025-26 (9th Cir. 2000).   An appropriate

2   inquiry into the grounds for a defendant's motion for new counsel is

3   required before the case can go forward.   <u>Hudson</u>, 686 F.2d at 829.

4        Here, Madsen had repeated opportunities to present concrete

5   evidence of the purported breakdown in communication between he and

6   Ulovec  during  trial  but  he  failed  to  demonstrate  that  any

7   communication  difficulty  was  sufficiently  serious  to  warrant

8   substitution of new counsel.

9        The  trial  court  held  a  <u>Marsden</u>  hearing  on  January  12, 1998

10  during  which  Madsen  requested  a  new  attorney  because,  despite

11  Madsen's  directions,  his  counsel  (1)  had  not  interviewed  certain

12  witnesses  including  inmates  Speck,  Hall,  Provencio,  Sukon  and

13  Bergman; (2) had failed to research Bradburn's background; and (3)

14  had not taken photographs of the segregation unit where the Cornejo

15  incident occurred. (Lodgment No. 13 at 7-21.)  During the hearing,

16  Ulovec methodically addressed each of Madsen's complaints explaining

17  that  he  had  hired  an  investigator,  interviewed  witnesses  where

18  available, made tactical decisions as to the effectiveness of each

19  witness,  and  considered  trial  strategies  concerning  background

20  checks and photographs.  (<u>Id</u>.)  At the conclusion of the hearing,

21  the court denied Madsen's motion stating that he had not met his

22  burden and Ulovec would remain his counsel.  (<u>Id</u>. at 21.)  Madsen

23  never alleged during the hearing that he was unable to communicate

24  with  his  attorney;  he  just  argued  that  Ulovec  did  not  follow

25  Madsen's suggestions.  (Id.)

26  ///

27  ///

28  ///

1    At the next three hearings[9], Madsen again challenged Ulovec's
2    performance, stating that there had been a breakdown in
3    communication because Ulovec insufficiently investigated whether
4    Bradburn had filed previous terrorist threat reports, and did not
5    check Bradburn's high school records. (Lodgment No. 13 at 333-341.)
6    Madsen further challenged Ulovec's questioning of witness Solano,
7    and Ulovec's failure to file a motion to exclude the substituted
8    razor blade, or put in a jury instruction regarding third party
9    culpability as to the razor blade. (Id. at 648.)

10    After hearing Ulovec explain his trial strategy yet again,
11    the court determined that there was no reason to hold another
12    Marsden hearing because there had simply been some "general
13    disagreement" about tactical decisions, but nothing rising to the
14    level requiring substitution of counsel. (Id. at 341.)

15    The record establishes that the trial court conducted
16    appropriate inquiries into Madsen's complaints but that Madsen
17    failed to sufficiently demonstrate that he and Ulovec had an
18    insurmountable communication breakdown. Ulovec's failure to follow
19    all of Madsen's suggestions in the manner Madsen instructed did not
20    deny him his right to counsel as a lawyer may make tactical
21    decisions even in the face of his client's explicit disapproval.
22    Brookhart v. Janis, 384 U.S. 1, 8 (1966); Schell, 218 F.3d at 1026.
23    Accordingly, the state court's refusal to substitute appointed
24    counsel for Madsen did not result in a violation of Madsen's Sixth
25    Amendment right to counsel, and the California Supreme Court's
26    denial of this claim was not contrary to, or an unreasonable

27    _____
28    [9]The hearings were held during trial on January 18, 20, and 22, 1998.
     (Supp. Lodgment No. 13.)

1   application of clearly established United States Supreme Court law.

2   **Attorney Conflict of Interest**

3       Madsen has failed to explain how Ulovec's alleged prior

4   representation of potential defense witness Bratton constituted a

5   conflict, nor did he raise this issue during any of the numerous

6   opportunities he had during trial.

7       Included in the Sixth Amendment right to counsel is a

8   "correlative right to representation that is free from conflicts of

9   interest." <u>Wood v. Georgia</u>, 450 U.S. 261, 271 (1981). Upon

10  notification prior to or during trial that an actual or potential

11  conflict of interest exists, a trial court is obliged to take

12  adequate steps to ascertain whether a conflict warrants substitution

13  of counsel. <u>See</u> <u>Campbell v. Rice</u>, 408 F.3d 1166, 1170 (9th Cir.

14  2005); <u>Holloway v. Arkansas</u>, 435 U.S. 475, 484 (1978). Where a

15  conflict of interest claim is raised after the conclusion of trial,

16  petitioner must show that trial counsel actively represented

17  conflicting interests, and that an actual conflict adversely

18  affected his performance. <u>See</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 783

19  (1987). To demonstrate an actual conflict of interest, "[t]he

20  client must demonstrate that his attorney made a choice between

21  possible alternative courses of action that impermissibly favored an

22  interest in competition with those of the client." <u>Washington v.</u>

23  <u>Lampert</u>, 422 F.3d 864, 872 (9th Cir. 2005) (quoting <u>McClure v.</u>

24  <u>Thompson</u>, 323 F.3d 1233, 1248 (9th Cir. 2003)). In conducting its

25  inquiry, a court is cautioned that the mere possibility of a

26  conflict is not sufficient. <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350

27  (1980).

28  ///

Madsen argues that Ulovec represented Bratton in a case that was tried during the pre-trial stages of Madsen's case.  Therefore, Madsen contends, Ulovec decided not to call Bratton to testify for the defense because "it could violate attorney-client privilege." (Pet. at 43.)  However, there is no indication that Ulovec knew about Bratton or his proffered testimony at any time during trial. During the <u>Marsden</u> hearing, Madsen methodically listed his grievances with Ulovec's representation, including the names of certain essential witnesses for the defense that Ulovec had not researched, but did not mention Bratton.  (Supp. Lodgment No. 13 at 9-17.)  Had Bratton been a necessary witness, it is highly unlikely Madsen would have forgotten to mention Bratton's name during the <u>Marsden</u> hearing.

The only evidence supporting Madsen's claim that Bratton could have been a potential witness is found in Bratton's declaration filed in support of Madsen's new trial motion, in which he stated that Cornejo told Bratton that Madsen did not attack him.[10] (Supp. Lodgment No. 17 at 689.)  However the declaration was offered after the trial and therefore, Ulovec's failure to call Bratton was not a decision he could have made based on any real or perceived conflict.  <u>Washington</u>, 422 F.3d at 872.  Accordingly, Madsen has not met his burden to demonstrate that there was an actual conflict of interest.  <u>Burger</u>, 483 U.S. at 783. In light of the above, it is "perfectly clear" that Madsen's claim that he was denied his constitutional right to counsel due to Ulovec's alleged conflict of interest has no merit.  <u>See</u> <u>Cassett</u>, 406 F.3d at 623-624.

---

[10]The declaration states it is that of "D.J. Barton", instead of D.J. Bratton, however the substance of the declaration comports with Madsen's claim, therefore as the Court of Appeal before it, this Court deems this to be the declaration of D.J. Bratton.

1         For the foregoing reasons, this Court **RECOMMENDS** that Ground

2    5 be **DENIED**.

3    **D.**     <u>**Peremptory Challenge to Trial Judge**</u>

4         In Ground 2, Madsen claims that the trial court violated his

5    federal due process rights and his rights under California Code of

6    Civil Procedure 170.6(1) because he was improperly deprived of his

7    right to challenge the trial judge.  (Pet. at 13.)  Furthermore, in

8    Ground 4, Madsen claims his Sixth Amendment right to effective

9    assistance of counsel was violated because Ulovec failed to timely

10   file a writ contesting the trial court's denial of his peremptory

11   challenge.  (<u>Id.</u> at 31.)

12        Respondent counters that there is no controlling United

13   States Supreme Court authority for the proposition that a defendant

14   has the right to compel his trial attorney to file a writ.[11]  (Answer

15   at 15.)  Even if there were, Respondent contends that Madsen would

16   not prevail under the standard ineffectiveness analysis because his

17   attorney had valid tactical reasons for not pursuing a writ.  (<u>Id.</u>)

18   <u>**Trial Court's Denial of Peremptory Challenge**</u>

19        Madsen raised his challenge to the trial court's denial of

20   his peremptory writ under California law and his ineffective

21   assistance claim in his direct appeal to the California Court of

22   Appeal.  (Lodgment No. 2.) However, he did not raise his federal due

23   process claim in the state courts so the claim is unexhausted.

24   Because, as illustrated below, it is "perfectly clear" that this

25   claim is without merit, it can be denied notwithstanding the

26   exhaustion issue. <u>See</u> <u>Cassett</u>, 406 F.3d at 623-624.

27   _____

28       [11]Respondent does not address Madsen's claim that his federal due process
     rights were violated.

1        To the extent Madsen argues the trial court erred by denying
2   his writ pursuant to California Code of Civil Procedure 170.6 he
3   fails to state a federal claim.  Estelle v. McGuire, 502 U.S. 62, 68
4   (1991) (federal habeas corpus relief does not lie for errors of
5   state law, and federal courts may not reexamine state court
6   determinations on state law issues).

7        To the extent that Madsen is making a general assertion that
8   his due process right to an impartial judge was violated because the
9   trial judge was biased, the claim fails because he has pointed to no
10  evidence in the record showing that Judge Vargas was biased.   In
11  fact, Madsen's trial counsel filed an affidavit which stated that he
12  did not seek a section 170.6(1) writ challenging Judge Vargas
13  because in previous experience, he found the judge to be "even-
14  handed, fair and thorough".  (Lodgment No. 17 at 812.)  Madsen does
15  nothing more than make vague and conclusory allegations that Vargas
16  was biased, which are insufficient to demonstrate a violation of his
17  federal due process rights.  James v. Borg, 24 F.3d 20, 26 (9th Cir.
18  1994).

19       In light of the above, the Court finds that Madsen does not
20  sufficiently allege a violation of his federal due process rights
21  vis a vis the denial of his peremptory writ challenging Judge
22  Vargas.   The Court **RECOMMENDS** that Madsen's federal due process
23  claim in Ground 2 be **DENIED**.

24                    **Ineffective Assistance of Counsel**

25       In evaluating the merits of Madsen's ineffective assistance
26  of counsel claim, this Court must look through to the last reasoned
27  state court decision.  See Ylst, 501 U.S. at 801-06.  Because the
28  California Supreme Court summarily denied Madsen's petition

(Lodgment No. 9), the last reasoned state court decision came from the California Court of Appeal (Lodgment No. 3).   The Court reasoned:

> Madsen contends he was denied effective assistance of counsel when his trial counsel did not file a timely Code of Civil Procedure section 170.3, subdivision (d) writ petition contesting the trial court's denial of his Code of Civil Procedure section 170.6 peremptory challenge of the trial judge, thereby causing his wavier of that issue on appeal. However, Madsen does not show that his counsel's decision not to seek writ relief was not a rational tactical decision, and, if not, that such writ petition would have been granted and that he would have received a more favorable result at trial.   In response to Madsen's new trial motion, his trial counsel filed an affidavit that stated in part:
>
>> "4. I did not seek a writ on the [Code Civ. Pros., §] 170.6 challenge to JUDGE VARGAS because in my prior appearances before JUDGE VARGAS, which had included trial and preliminary hearings, I had found him to be even-handed, fair, and thorough in his evidentiary rulings.  It was my belief that we would receive a fair trial before JUDGE VARGAS."
>
> Madsen's trial counsel made an express tactical decision not to file a writ petition contesting the trial court's denial of Madsen's peremptory challenge of the trial judge.  His tactical decision was based on his belief, based on his prior appearances before Judge Vargas, that Madsen would receive a fair trial before Judge Vargas.  Madsen does not show that his trial counsel's tactical decision fell below the objective standard of reasonableness under prevailing professional norms for defense attorneys. Furthermore, he does not show that his peremptory challenge would have been granted had a writ petition been filed or that he would have received a more favorable result at trial before a judge other than Judge Vargas.  Madsen has not carried his appellate burden to show that he was denied effective assistance on this ground.

(Lodgment No. 3 at 13-14, 21-22.)

///

///

1    "The benchmark for judging any claim of ineffectiveness must
2    be whether counsel's conduct so undermined the proper functioning of
3    the adversarial process that the trial cannot be relied on as having
4    produced a just result."  Strickland v. Washington, 466 U.S. 668,
5    686 (1984).  To prove ineffective assistance of counsel, a defendant
6    must show: (1) that counsel's performance was deficient and (2) that
7    the deficient performance prejudiced the defense.  Id. at 687.  The
8    proper measure of attorney performance is "simply reasonableness
9    under prevailing professional norms."  Id. at 688.  In reviewing the
10   reasonableness of counsel's performance, courts "must indulge a
11   strong presumption that counsel's conduct falls within the wide
12   range of reasonable professional assistance. . . ."  Id. at 689.
13   Finally, to determine whether counsel's errors prejudiced the
14   defense, courts "must consider the totality of the evidence before
15   the judge or jury" and whether "the defendant has met the burden of
16   showing that the decision reached would reasonably likely have been
17   different absent the errors."  Id. at 696.

18       Ulovec's decision not to file a writ petition was based on
19   his stated belief that Madsen would get a fair trial before Judge
20   Vargas. (Lodgment No. 17 at 812.)  This is a tactical decision
21   properly made by the attorney.  See Lord v. Wood, 184 F.3d 1083,
22   1085 (9th Cir. 1999).  Moreover, it was a reasonable decision based
23   on the facts set forth in counsel's affidavit.  Strickland, 466 U.S.
24   at 686.  Accordingly, Madsen fails to meet Strickland's first prong.
25   Id. at 691-692.

26       As to Strickland's second prong, Madsen has not demonstrated
27   that he suffered prejudice as a result of Ulovec's decision because
28   he has not shown that he would have received a more favorable result

1  at trial before a different judge, nor has he shown that Judge

2  Vargas was prejudiced against him.  (Lodgment No. 3 at 21-22.)

3  Accordingly, Madsen fails to show that he suffered any prejudice as

4  a result of Ulovec's decision to refrain from filing the peremptory

5  writ.  See Strickland, 466 U.S. at 691-692.

6       Because Madsen failed to meet the standard for ineffective

7  assistance of counsel set forth in Strickland, the California Court

8  of Appeal's denial of this claim was not contrary to, or an

9  unreasonable application of, clearly established United States

10  Supreme Court law.  The Court therefore **RECOMMENDS** that the portion

11  of Ground 4 concerning the peremptory writ be **DENIED**.

12  **E.    Joinder of Counts**

13       In Ground 3, Madsen argues that the trial court violated his

14  Fourteenth Amendment rights when it improperly joined Counts 1 and

15  2, concerning the attack on Cornejo, with Count 3, possession of a

16  sharp object, and Count 4, the terrorist threat against Deputy

17  Michael Bradburn ("Bradburn"). (Pet. at 22.)  Respondent argues that

18  the California Court of Appeal found that Madsen suffered no

19  prejudice from the joinder of counts, therefore it is immaterial

20  whether or not the joinder was proper.  (Answer at 17.)  Further,

21  Respondent claims there is no federal Constitutional protection

22  against improper joinder, and the only U.S. Supreme Court precedent

23  relies on the common law, therefore this claim does not present a

24  federal question and the claim should be denied.  (Id. at 17-18.)

25       Again, this Court must look through to the last reasoned

26  state court decision which was issued by the California Court of

27  Appeal. (Lodgment No. 3.)

28  ///

The Court explained:

B

[California Penal Code] Section 954 provides in part:

> "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . [T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

If the statutory requirements for section 954 joinder are met, a defendant must show that the trial court abused its discretion by denying a motion to sever the trial of the charged offenses into separate trials. (*People v. Mayfield* (1997)14 Cal.4th 668, 720; *People v. Davis* (1995) 10 Cal.4th 463, 508.) "Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173.)  However, even if the charged offenses do not qualify for section 954 joinder, a defendant must show prejudice from an erroneous joinder. (*People v. McLain* (1988) 46 Cal.3d 97, 105-106.)  To do so, the defendant must show that it is reasonably probable the defendant would have received a more favorable result had the charged offenses been separately tried. (*Ibid.*; *People v. Watson* (1956) 46 Cal.2d 818,836.)  Alternatively, the defendant must show the erroneous joinder resulted in a miscarriage of justice in violation of article VI, section 13 of the California Constitution. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, §

3276, pp 4041-4043; *People v. Saldana* (1965) 233 Cal.App.2d 24, 30-31; *People v. Fox* (1958) 157 Cal.App.2d 426, 430; *People v. Renier* (1957) 148 Cal.App.2d 516,520.)   Finally, "[e]ven if the [joinder] ruling was correct when made, we must reverse if defendant shows that joinder actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

C

Assuming arguendo the trial court erred by denying Madsen's motion to sever the trial of counts 1 and 2 from the trial of counts 3 and 4, [We do not decide whether, as the People assert, all four counts were of the same class, shared common elements of substantial importance, or were connected in their commission, making their section 954 joinder proper. (Cf. *People v. Poggi* (1988) 45 Cal.3d 306,320; *People v. Leney* (1989) 213 Cal.App.3d 265,269.)] we nevertheless conclude he does not show the assumed error was prejudicial or that his convictions should otherwise be reversed for gross unfairness in his trial that denied him due process.   It is not reasonably probable that Madsen would have received a more favorable result had the severance motion been granted.   First, some of the evidence on counts 1 and 2 was cross-admissible on count 3 or 4.   Madsen's attack on Cornejo (counts 1 and 2) was admissible to show Bradburn's fear when Madsen threatened him (count 4). Furthermore, Madsen's possession and use of a sharp object during his attack on Cornejo (counts 1 and 2) was admissible to show he knowingly possessed a razor blade or other sharp instrument on another occasion (count 3).   Conversely, Madsen's possession of the razor blade or sharp instrument (count 3) was admissible to show that he had access to and possessed the sharp object used in his attack on Cornejo (counts 1 and 2).

Furthermore, although counts 1 and 2 presumably were more inflammatory offenses than counts 3 and 4, the evidence on all four counts was strong, thereby eliminating the likelihood that the jury convicted Madsen on counts 3 and 4 because of his commission of counts 1 and 2.   The prosecution's evidence on counts 3 and 4 was not weak and there was no spillover effect from evidence on counts 1 and 2 that might have affected the jury's verdict.   On count 3 the evidence showed that a razor blade from a disposable razor was found in Madsen's cell hidden in the spine of a legal pad bearing Madsen's writing.   The legal pad was found with other legal pads and papers belonging to Madsen inside an accordion file in Madsen's cell.   Additional evidence showed that on

-29-

another occasion a razor was found hidden in Madsen's personal mattress in his cell. On another occasion a razor was found inside a rolled-up newspaper in Madsen's cell and a sharp, bent metal piece was found wrapped in tissue in an envelope inside his cell. The evidence on count 3 that Madsen knowingly possessed the razor blade therefore was strong. Similarly, the evidence on count 4 was also strong. Bradburn testified that Madsen threatened to kill him or have someone else kill him. Bradburn testified that he was especially frightened by Madsen's threat because he knew Madsen was a "high-powered" inmate, had been housed in solitary confinement as one of the worst inmates in Pelican Bay prison, had recently stabbed another inmate, and belonged to a prison gang. Bradburn wrote a report on the threat and told a fellow guard about the threat. After another guard told Madsen that Bradburn had filed a report on the incident, Madsen told the guard that the incident was his (Madsen's) mistake and that he wanted to apologize to Bradburn and "squash" the matter. Therefore, the evidence on count 4 was strong. Conversely, it is unlikely the jury convicted Madsen on counts 1 and 2 because of evidence admitted to show his commission of counts 3 and 4. The evidence on counts 1 and 2 was strong. Before the incident, a guard saw Madsen in the common area with Cornejo and two other inmates. The guard later saw Cornejo bleeding profusely from the face and Madsen was showering together with the other two inmates. Madsen and the other two inmates continued to shower for minutes after a lockdown was ordered. Solano gave a guard a letter written by Madsen that effectively admitted he attacked Cornejo, stating in part: "YES I DID HIM." Madsen attached a newspaper article on the Cornejo attack to his letter. Solano testified that he transferred a razor blade shank to Madsen's cell a few days before the attack and that two days before the attack he overheard Madsen tell Espinoza that he was going to "get" Cornejo. At the time of the incident, Solano saw Madsen, Bergam and Espinoza follow Cornejo to his cell. He later saw Madsen removing his clothes as he walked toward the showers. Madsen had red marks on his chest and appeared agitated. Later, guards searched Madsen's cell and found two unaltered razors and wet jailhouse clothing hanging on an unauthorized line. The evidence supporting Madsen's convictions on counts 1 and 2 was strong. Therefore, it is unlikely the gang evidence or other evidence admitted to show Madsen's commission of counts 3 and 4 had an inflammatory spillover effect, causing the jury to convict him of counts 1 and 2.

///

We conclude it is not reasonably probable Madsen would have received a more favorable result had the trial of counts 1 and 2 been severed from the trial of counts 3 and 4. (*People v. McLain*, supra, 46 Cal.3d at pp. 105-106; *People v. Watson*, supra, 46 Cal.2d at p.836.)  Furthermore, Madsen does not show that on the record in this case there was a miscarriage of justice because all four counts were jointly tried. (Cal.Const., art. VI, § 13; *People v. Saldana*, supra, 233 Cal.App.2d at pp. 30-31; *People v. Fox*, supra, 157 Cal.App.2d at p. 430; *People v. Renier*, supra, 148 Cal.App.2d at p.520.)  Finally, Madsen does not show that the joinder of all four counts actually resulted in gross unfairness or otherwise denied him due process. (*People v. Arias*, supra, 13 Cal.4th at p.127.)  Therefore, any error by the trial court in denying Madsen's severance motion was not prejudicial and does not require reversal for any of his convictions.

(Lodgment No. 3 at 15-19.)

Clearly established United States Supreme Court law states that: "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder 'rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his [constitutional] right to a fair trial'." United States v. Lane, 474 U.S. 438, 449 (1986)(citing Kotteakos v. U.S., 328 U.S. 728, 776 (1946).

In U.S. v. Akana, 210 Fed.Appx. 681, 682 (9th Cir. 2006), the court held that joinder of four counts was not prejudicial where "evidence of Counts 1, 2 and 3 would be admissible in a trial for Count 4, and vice versa, to show intent, knowledge, or lack of mistake or accident." Id. at 682-83; see also, Davis v. Butler, 210 Fed.Appx. 584, 586 (9th Cir. 2006)(no prejudice where two robbery counts joined for trial because evidence as to each count would have been cross-admissible in separate trials).

Madsen argues that "the Cornejo assault an[sic] the allegation of the deliberate mutilation of a human being as

1    aggravated mayhem was clearly more inflammatory than the possessory
2    and verbal offenses tried with it.   Moreover, the prejudicial
3    'spillover' effect was plainly at work. . ."  (Pet. at 28.)   The
4    Court of Appeal did not determine whether joinder of Counts 1 and 2,
5    with Count 3 and Count 4 was proper, however it thoroughly reviewed
6    the record and determined that Madsen suffered no prejudice as a
7    result of the joinder. (Lodgment No. 3 at 19.)   As the Court of
8    Appeal properly noted, evidence from Counts 1 and 2 (the assault on
9    Cornjeo) was cross-admissible on Count 3 to show that Madsen
10   knowingly possessed a razor blade, and on Count 4 to show that
11   Bradburn's fear was reasonable because Madsen was a high-powered,
12   dangerous inmate who previously had attacked another inmate. <u>See</u>
13   <u>Akana</u>, 210 Fed.Appx. 682.  Moreover, the jury was instructed that
14   they were to decide each count separately because each charged a
15   distinct crime.[12]   Jurors are presumed to follow such instructions,
16   <u>Estelle</u>, 502 U.S. at 71-72, therefore Madsen fails to show that
17   joinder was so manifestly prejudicial that it outweighed the
18   dominant concern with judicial economy and required the court to
19   sever the counts for trial.  <u>United States v. Kinslow</u>, 860 F.2d 963,
20   966 (9th Cir. 1988).  Madsen offers nothing more than speculation as
21   to the purported "spillover" effect of evidence from Counts 1 and 2
22   to Counts 3 and 4, which is insufficient to carry his burden.

23        In light of the above, the Court of Appeal decision denying
24   Madsen's joinder claim was not contrary to, or an unreasonable
25   application of, clearly established United States Supreme Court law.
26   Therefore, this Court **RECOMMENDS** that Claim 2 be **DENIED**.

27

28        [12]CALJIC 17.02 states in pertinent part: "Each Count charges a distinct
          crime.  You must decide each Count separately."

1  **F.**      <u>**Ineffective Assistance of Counsel**</u>

2      In Ground 4, Madsen asserts multiple claims of ineffective

3  assistance of trial counsel including failure to call certain

4  witnesses, failure to impeach Victor Solano ("Solano")(a witness for

5  the prosecution), and failure to cross-examine the document

6  examiners regarding a handwriting exemplar.[13] (Pet. at 36.)

7         **Failure to Call Certain Witnesses**

8      Madsen argues that Ulovec failed to investigate and call

9  eight witnesses who were essential to the effective presentation of

10  his case. (Pet. at 36.) In particular, Madsen asserts that Ulovec

11  should have called William Berger, "Mr. Viezaga", Dennis "DJ"

12  Bratton, Greg Jennings, Jesse Provencio, Juan Gonzales, Linda

13  Provencio and Leslie Bowers. (<u>Id</u>.)

14      Respondent contends that Madsen did not suffer ineffective

15  assistance of counsel for Ulovec's failure to call these witnesses,

16  and therefore the Court should deny the claims. (Answer at 25.)

17  Respondent further argues that this claim is unexhausted as to Linda

18  Provencio and Leslie Bowers because Madsen did not mention either of

19  these witnesses in his appeals to the state courts, therefore this

20  Court does not have jurisdiction to adjudicate the claim, unless it

21  finds it is "perfectly clear" that it has no merit. (<u>Id</u>.) In

22  addition, Respondent contends that Madsen did not raise any claim as

23  to "Mr. Viezaga" in his Court of Appeal filings, but only mentioned

24  him in his California Supreme Court habeas petition, suggesting that

25  Madsen himself did not know about Viezaga at trial. (<u>Id</u>. at 27.)

26  Therefore, Madsen failed to show that Ulovec knew of Viezaga or

27      [13]For ease of analysis, the Court will address the independent ineffective assistance of counsel claims in this section. Madsen's remaining ineffective assistance of counsel claims will be addressed in the section examining the
28  related substantive claim.

1  could have with reasonable diligence learned about him during trial,

2  and his failure to call Viezaga did not constitute ineffective

3  assistance of counsel.  (Id.)

4  **Witnesses Berger, Bratton, Jennings, Jesse Provencio, and Gonzalez**

5          As before, this Court must look through to the last reasoned

6  state court decision issued by the California Court of Appeal.

7  (Lodgment No. 3.)   The court found no ineffective assistance of

8  counsel:

9          Madsen contends that because his trial counsel
10     did not call certain witnesses to testify in his
       defense he was denied effective assistance of
11     counsel.  He asserts that William Berger was an
       inmate who witnessed the Cornejo incident and could
12     have testified favorably for Madsen's defense had
       trial counsel called him.  He argues that Berger
13     would have testified that Madsen did not enter
       Cornejo's cell and that Espinoza did.  However, in
14     his declaration submitted in support of Madsen's new
       trial motion, Berger stated that he did not see
15     Madsen enter Cornejo's cell.   That proffered
       testimony is not an affirmative statement that Madsen
16     did not enter Cornejo's cell.  Furthermore, Madsen
       does not show that his trial counsel's decision not
17     to call Berger as a witness was not a rational
       tactical decision based [on] the lack of probative
18     value of Berger's testimony or the possibility that
       he would be impeached and discredited by the
19     prosecutor, reflecting poorly on the defense.

20         Madsen asserts that "D.J." Bratton (misspelled
       as Barton on his declaration) was another inmate who
21     witnessed the Cornejo incident and could have
       provided testimony favorable to his defense.  In his
22     declaration in support of Madsen's new trial motion,
       Bratton stated that Cornejo told him after the
23     assault that Madsen did not participate in the
       assault on him and that he named Madsen as a
24     participant to bolster his civil suit for damages
       against San Diego County.  However, Madsen does not
25     show that he told his trial counsel about Bratton's
       proffered testimony or that with reasonable diligence
26     his counsel could have learned about it.
       Furthermore, Madsen does not show that Bratton's
27     proffered testimony would not have been excluded by
       the trial court as inadmissible hearsay; that Bratton
28     would not have been successfully impeached by the
       prosecutor; and that his trial counsel could not have

1     made a rational tactical decision not to call Bratton
       as a witness.
2
3          Madsen asserts that Greg Jennings was another
       inmate who could have provided favorable testimony
4      for his defense.  In his declaration in support of
       Madsen's new trial motion, Jennings stated that he
5      knew Madsen and Solano had a fistfight before the
       Cornejo incident and that in his presence Solano
6      expressed hatred and animosity toward Madsen.  Madsen
       apparently argues that Jenning's proffered testimony
7      would have impeached Solano's credibility.  However,
       Madsen does not show that he told his trial counsel
8      about Jennings's proffered testimony or that with
       reasonable   diligence   his   counsel   could   have
9      discovered it.  Furthermore, Madsen does not show
       that Jennings would not have been successfully
10     impeached by the prosecutor and that his trial
       counsel could not have made a rational tactical
11     decision not to call Jennings as a witness.  On the
       contrary, it appears that Madsen's trial counsel made
12     an express tactical decision not to directly attack
       Solano's credibility because he believed Solano's
13     version of the Cornejo incident could be used to
       Madsen's advantage by allowing him to argue that
14     Espinoza, not Madsen, was Cornejo's actual attacker.
       Therefore, his trial counsel could have made a
15     tactical decision not to call Jennings to impeach
       Solano's credibility.  Madsen does not show that his
16     trial counsel's tactical decision was not rational
       and fell below the objective standard of reasonable
17     performance of defense attorneys.

18         Madsen asserts that Jesse Provencio was another
       inmate who could have provided favorable testimony
19     for his defense.  In his declaration in support of
       Madsen's new trial motion, Provencio stated that
20     after the Bradburn incident Bradburn approached
       Madsen and told him he was going to "get" him.
21     Madsen's trial counsel was aware of Provencio's
       proffered testimony but made a tactical decision not
22     to call him as a witness because he did not believe
       Provencio would be a credible witness.  During the
23     Marsden hearing, Madsen's trial counsel explained
       that he had spoken with Provencio's former attorney,
24     who indicated that Provencio would not be a reliable
       witness.  Madsen's trial counsel also believed that
25     Provencio's proffered testimony would support, rather
       than disprove, the prosecution's charge that Madsen
26     had threatened Bradburn.  Madsen does not show that
       his trial counsel's decision not to call Provencio
27     was not a rational tactical decision or was otherwise
       below   the   objective   standard   of   reasonable
28     performance of defense attorneys.

Madsen asserts that Juan Carlos Gonzalez was another inmate who could have provided favorable testimony for his defense. In his declaration in support of Madsen's new trial motion, Gonzalez stated that after the incident between Bradburn and Madsen when Gonzalez did not terminate a telephone call quickly enough, Bradburn told Gonzalez: "You three strikers think you're running the place around here. If you're not careful, I'll set you up just like I did Madsen." However, Madsen does not show that his trial counsel was aware of Gonzalez's proffered testimony or that with reasonable diligence he could have learned about it. Furthermore, Madsen does not show that Gonzalez would have been a credible witness or that his trial counsel could not have made a rational tactical decision that Gonzalez's proffered testimony would support, rather than disprove, the prosecutor's claim that Madsen had threatened Bradburn.

Therefore, we conclude Madsen has not shown that his trial counsel's failure to call these five witnesses to testify in his defense was below the objective standard or reasonable performance of defense attorneys. His counsel could have made rational tactical decisions not to call them as witnesses based on their lack of credibility or a belief that their testimonies might support the prosecution's case, rather than Madsen's defense case. Furthermore, Madsen does not show that he was prejudiced by the omission of the testimonies of these five witnesses. He does not show it is reasonably probable that he would have received a more favorable result had any or all of the five witnesses testified at trial. On the contrary, the evidence in support of his convictions was convincing and it is unlikely that their proffered testimonies would have changed the jury's verdicts.

(Lodgment No. 3 at 25.)

In <u>Strickland</u>, the United States Supreme Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 690-691. Similarly,

clearly established Ninth Circuit law holds that "a lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999). Failure to take steps necessary to produce key witnesses at trial can result in a finding of ineffectiveness. Lord, 184 F.3d at 1093. However, an attorney is not required to present trial testimony from every witness suggested by defendant. United States v. Wadsworth, 830 F.2d 1500, 1509 (9th Cir. 1987)(trial tactics are clearly within the realm of powers committed to the discretion of defense counsel).

A review of the record confirms the facts supporting the appellate court's conclusions. For example, William Berger stated in his declaration in support of Madsen's new trial motion that "[a]t no time prior to Mr. Cornejo's appearance in the day room showing evidence of facial wounds, did I see Richard Madsen enter Cornejo's cell." (Supp. Lodgment No. 17 at 680.) As the appellate court correctly determined, Berger's statement does not affirmatively conclude that Madsen never entered Cornejo's cell. Similarly, Jesse Provencio's declaration in support of Madsen's new trial motion states that sometime after Madsen's threat to Bradburn, Provencio was "in the company of Richard Madsen at the Central Jail Facility when Deputy Bradburn came up to Mr. Madsen and told him he [the Deputy] was going to "get" Madsen." (Supp. Lodgment No. 17 at 683.) Ulovec stated during the Marsden hearing that "far from helping Mr. Madsen, Mr. Provencio's testimony would aid in confirming Deputy Bradburn's position he was indeed threatened by

1   Mr. Madsen" and therefore he made a tactical decision not to call

2   Provencio. (Supp. Lodgment No. 12 at 645.)

3        Accordingly, trial counsel's failure to call Bratton,

4   Jennings, Provencio, and Gonzalez was not unreasonable because the

5   proffered testimony had little probative value, could potentially

6   derail the defense case, would subject the witness to cross-

7   examination and or impeachment that could detrimentally affect

8   Madsen's case, or was unknown to trial counsel prior to trial.

9   <u>Strickland</u>, 466 U.S. at 690-691.

10                          **Mr. Viezaga**

11       Madsen did not make any claim as to witness "Mr. Viezaga" in

12   the Court of Appeal, however he raised this issue in his habeas

13   corpus petition filed with the California Supreme Court which was

14   silently denied. (Lodgment No. 16.) Because the state court did not

15   furnish a basis for its reasoning, this Court must conduct an

16   independent review of the record to determine whether the denial is

17   contrary to, or an unreasonable application of, clearly established

18   Supreme Court law. <u>Himes</u>, 336 F.3d at 853.

19       Madsen alleges that inmate Viezaga would have testified that

20   Bergman, not Madsen, entered Cornejo's cell, after which Cornejo

21   emerged bleeding. (Lodgment No. 11 at 170.) Madsen claims that

22   Viezaga gave a statement to authorities with this information.

23   (<u>Id</u>.) However, Madsen provides no evidence to support this

24   allegation and the trial record contains no mention of Viezaga or

25   Viezaga's purported statement to authorities. Accordingly, Madsen

26   has not demonstrated that trial counsel knew about Viezaga or with

27   reasonable diligence could have learned about him. Therefore, trial

28   counsel's failure to investigate and present Viezaga at trial was

1   reasonable and did not constitute ineffective assistance. <u>See</u>

2   <u>Strickland</u>, 466 U.S. 690-91.

3   ### Linda Provencio and Leslie Bowers

4       Madsen did not raise his claims concerning Linda Provencio

5   and Leslie Bowers in any state court, thus the claims appear to be

6   unexhausted. <u>See</u> <u>Rose</u>, 455 U.S. at 518-21; <u>Picard</u>, 404 U.S. at 275.

7   However, under <u>Cassett</u>, 406 F.3d at 623-624, this Court can deny the

8   claims if it is perfectly clear that they are without merit.

9       In his petition, Madsen simply states that he suffered

10  ineffective assistance of counsel for "Ulovec's failure to

11  investigate, interview, subpoena a number of witnesses essential to

12  the effective presentation of Petitioner's case, defense witnesses

13  . . .Linda Provencio, Leslie Bowers." (Pet at 36.)  He fails to

14  state to what facts Linda Provencio and Leslie Bowers would testify,

15  whether he told Ulovec about these potential witnesses before trial,

16  and why trial counsel should have called them. (<u>Id</u>.)  Without any

17  indication as to how their testimony would have helped the defense

18  case, Madsen has not established that Ulovec's performance was

19  unreasonable or that he was prejudiced. <u>Strickland</u>, 466 U.S. at

20  697; <u>see</u> <u>also</u> <u>Jones v. Gomez</u>, 66 F.3d 199, 204-05 (9th Cir.

21  1995)(affirming district court's denial of habeas relief where

22  petitioner's conclusory allegations failed to meet the habeas rules'

23  specificity requirement).

24      For the foregoing reasons, the California Court of Appeal's

25  denial of Madsen's ineffective assistance of counsel claims

26  concerning Ulovec's failure to call William Berger, Dennis Bratton,

27  Greg Jennings, Jesse Provencio, and Juan Gonzales was not contrary

28  to, or an unreasonable application of, controlling United States

1 | Supreme Court authority. See Patton, 467 U.S. at 1038. Furthermore,
2 | the California Supreme Court's silent denial of his claim as to
3 | Viezaga was not contrary to, or an unreasonable application of,
4 | controlling United States Supreme Court law. Id. Finally, despite
5 | being unexhausted, it is "perfectly clear" that his claims as to
6 | Linda Provencio and Leslie are without merit, and can be denied.
7 | Cassett, 406 F.3d at 623-24. Therefore, the Court **RECOMMENDS** that
8 | the portion of Ground 4 concerning failure to call witnesses be
9 | **DENIED**.

### Failure to Impeach Solano

11 | Madsen argues that Ulovec also was ineffective for failing to
12 | impeach "the prosecution's star witness, informant 'Victor Solano.'"
13 | (Pet. at 36.) Madsen contends there is no merit to Ulovec's
14 | explanation that he chose not to impeach Solano because Solano's
15 | testimony could be helpful to the defense. (Id.) Respondent
16 | counters that the Court of Appeal correctly determined that Ulovec's
17 | decision to refrain from impeaching Solano was a sound tactical
18 | decision because his testimony suggested that someone else may have
19 | committed the assault on Cornejo. (Answer at 20-21.)

20 | As before, this Court must look through to the last reasoned
21 | state court decision which was issued by the California Court of
22 | Appeal. (Lodgment No. 3.) The Court of Appeal stated:

> Madsen contends that he was denied effective
> assistance of counsel when his trial counsel made the
> tactical decision not to impeach Solano, a witness
> for the prosecution. During the Marsden hearing,
> Madsen's trial counsel stated that he made a tactical
> decision not to impeach Solano because he believed
> Solano could provide favorable testimony for the
> defense. He believed Solano's version of the Cornejo
> incident would support the defense theory that
> Espinoza, not Madsen, committed the assault on
> Cornejo. He believed Solano would testify that he

1      did not see Madsen enter Cornejo's cell and that when
he first saw Cornejo bleeding, Madsen was in the
2      shower area and Espinoza was just then walking up the
stairs to the shower area.

3

4           Madsen argues that his trial counsel's decision
not to impeach Solano was not a rational tactical
5      decision and fell below the objective standard of
reasonable performance of defense attorneys.
6      However, we cannot conclude that his counsel's trial
strategy was irrational and fell below the applicable
7      standard. Madsen's counsel was faced with very
incriminating facts tending to show Madsen was
8      involved in the Cornejo assault. On the record in
this case, it was not an irrational tactical decision
9      to attempt to use Solano's testimony on the incident
to show that Espinoza, and not Madsen, committed the
10      assault. Although Solano testified on other events
that did not support the defense theory, Madsen's
11      trial counsel attempted to make the best of a
difficult case by not impeaching Solano.
12      Furthermore, Madsen does not show that Solano could
have been successfully impeached and, even were he
13      impeached, that the other evidence, including
Madsen's letter admitting his attack on Cornejo,
14      would have been deemed insufficient by the jury to
prove Madsen's guilt of counts 1 and 2. The trial
15      strategy of Madsen's counsel, although ultimately
unsuccessful, cannot be considered irrational.

16  (Lodgment No. 3 at 26-27.)

17      Madsen does not show that Ulovec's decision to refrain from

18  impeaching Solano fell below the objective standard of performance

19  of defense attorneys, especially in light of the possibility that

20  Solano's testimony could in fact be beneficial to the defense. See

21  Strickland, 466 U.S. at 697. On direct examination, the prosecution

22  asked Solano to describe what he saw at the time of the attack:

23      Q:   When did you first see Mr. Madsen after he
disappeared in the area of the stairwell headed
24           in the direction of Mr. Cornejo's cell?

25      A:   About ten minutes later.

26      Q:   And where was he when you first saw him at that
time?
27

28      A:   He was coming out from underneath the stairwell.

1     Q:    Which stairwell?

2     A:    The one that is closest to Mr. Cornejo's cell.

3     Q:    And you described seeing red marks around his
             neck; is that right?

4

5     A:    Yes, sir.

     Q:    Did you notice anything else about his physical
6              condition when you saw him?

7     A:    He was kind of agitated.

8 (Supp. Lodgment No. 12 at 198-199.)

9        On cross examination, Ulovec effectively questioned Solano

10 who revealed that Madsen was already in the shower area when Solano

11 first saw the injured Cornejo and Espinoza was just heading up the

12 stairs at that time.  (Supp. Lodgment No. 12 at 213.)  During one of

13 Madsen's many challenges to Ulovec's representation during trial,

14 Ulovec stated "I decided I really didn't particularly want to

15 impeach Mr. Solano to make him look like he was being untruthful

16 because I feel that I may have been able to in essence 'go through

17 the back door' through the prosecution's own witness and establish

18 that Mr. Madsen is innocent of the offense." (Supp. Lodgment No. 13

19 at 16.)  Ulovec made a sound tactical decision to refrain from

20 impeaching Solano so that he could use the testimony to support the

21 inference that Espinoza committed the assault, and therefore his

22 performance was not unreasonable.  <u>Lord</u>, 184 F.3d at 1093.  For the

23 foregoing reasons, Ulovec's decision not to impeach Solano does not

24 constitute ineffective assistance of counsel, and the California

25 Supreme Court's denial of this claim was not contrary to, or an

26 unreasonable application of, clearly established United States

27 Supreme Court law.

28 ///

1        **Failure to Cross-Examine Document Examiners**

2                Madsen   further   contends   Ulovec   provided ineffective

3    assistance by failing to object to the method by which Marjorie Ann

4    Fair ("Fair") obtained a handwriting exemplar from Madsen, and by

5    failing to question both Fair, and William Leaver, the document

6    examiner who established that the legal pad containing the razor

7    blade had Madsen's writing on it.  (Pet. at 36-37.)  Madsen argues

8    that Ulovec should have cross-examined Leaver about the photocopied

9    note, or "kite", and Leaver's receipt of the razor blade in the

10   legal pad and his return of the pad without the blade to Garcia.

11   (Id. at 37.)  Madsen further complains that Ulovec was ineffective

12   for  failing  to  hire  a  document  examiner  to  rebut  Leaver's

13   conclusions, and testify that the photocopy of the "kite" could not

14   be proven to be written by Madsen.  (Id.)

15               Respondent counters that Madsen has not demonstrated that a

16   photocopied handwriting sample cannot be meaningfully compared to an

17   original document, nor has he shown that it was not his handwriting

18   in the "kite"; and, therefore counsel was not unreasonable for

19   failing to challenge the handwriting evidence.  (Answer at 28.)

20               Madsen did not raise this issue on direct appeal, but did

21   raise it in his habeas petition in the California Supreme Court,

22   which was silently denied.  (Lodgment No. 16.)  Because the state

23   court did not furnish a basis for its reasoning, this Court must

24   conduct an independent review of the record to determine whether the

25   denial is contrary to, or an unreasonable application of, clearly

26   established Supreme Court law.  Himes, 336 F.3d at 853.

27   ///

28   ///

1          **Marjorie Ann Fair**

2          Madsen does not state the error he alleges existed in Fair's

3  method of obtaining his handwriting exemplar, nor can this Court

4  find such an error.   It is clearly established law that a suspect

5  can be compelled to provide a handwriting exemplar, as it is an

6  "identifying physical characteristic" and is therefore outside the

7  Fifth   Amendment's   privilege   against   self-incrimination.

8  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 591 (1990).   Here, Fair

9  testified about her training and experience as a fingerprint and

10  evidence technician for the San Diego County District Attorney's

11  office. (Supp. Lodgment No. 12 at 228-29.)   She also explained the

12  method by which she obtained the exemplar stating that she dictated

13  a passage to Madsen while in a courthouse holding cell which Madsen

14  then wrote on a white piece of paper. (<u>Id</u>.)   Madsen has not

15  identified what advantage he could have gained by his counsel cross-

16  examining Fair about the method she used to obtain the exemplar nor

17  what prejudice he suffered as a result of counsel's decision not to

18  conduct such a cross examination.   This conclusory allegation is not

19  sufficient.   Rule 2(c), 28 U.S.C. foll. § 2254; <u>see also</u> <u>Boehme v.</u>

20  <u>Maxwell</u>, 423 F.2d 1056, 1058 (9th Cir. 1970) (trial court's

21  dismissal of federal habeas proceeding affirmed where petitioner

22  made conclusory allegations instead of factual allegations showing

23  that he was entitled to relief).

24          Moreover, Madsen's contention that Ulovec did not cross-

25  examine Fair is incorrect; Ulovec did cross-examine Fair. (Supp.

26  Lodgment No. 12 at 230.)   However, Ulovec limited his cross-

27  examination to asking the date Fair obtained the sample. (<u>Id</u>.)   It

28  was reasonable for Ulovec to limit his cross-examination of Fair

because Fair's qualifications and the process by which she took the sample were discussed in detail on direct examination, and there was nothing out of the ordinary to challenge. See Woodson, 526 F.2d at 551. Similarly, it was reasonable for Ulovec to refrain from objecting to the handwriting exemplar as it was a standard method for establishing ownership of the legal pad, and there was no Fifth Amendment protected right. See Muniz, 496 U.S. at 591. Finally, Madsen fails to demonstrate how Ulovec's decision not to further cross-examine Fair or object to the handwriting exemplar in any way prejudiced him other than to make conclusory allegations which cannot support habeas relief under Rule 2. See Rule 2(c)(1)-(3), 28 U.S.C. foll. §2254.

### **William Leaver**

Similarly, document examiner Leaver testified that he compared the handwriting exemplar to the handwriting on the legal pad containing the razor blade recovered from Madsen's cell and determined the handwriting was "the writing of a common author; in other words, they are written by the same person." (Supp. Lodgment No. 12 at 234.) Leaver also compared a copy of the "kite" to the exemplar and determined they were authored by the same person. (Id. at 234-34.)

Madsen initially contends that the handwriting in the photocopied "kite" cannot be compared to a handwriting exemplar and that Ulovec should have questioned Leaver regarding the validity of such comparisons. (Pet. at 36.) However, Madsen presents no evidence to support his bald assertion that a handwriting analysis cannot be performed on photocopied documents. Madsen also has not presented any evidence indicating that cross-examining Leaver on

1   this topic would have benefitted Madsen's defense.  In fact, cross-
2   examining Leaver on this topic may have reinforced to the jury the
3   validity of Leaver's analysis and conclusion.  Accordingly, Madsen
4   has  not  established  that  his  attorney  provided  inadequate
5   representation  when  he  failed  to  examine  Leaver  on  the  topic  of
6   analyzing  photocopies  nor  that  Madsen  was  prejudiced  by  the
7   decision.  Strickland, 466 U.S. at 690-91.

8       Madsen argues that Ulovec also was ineffective because he did
9   not cross-examine Leaver regarding the loss of the razor blade while
10  the  legal  pad  was  in  Leaver's  possession.   (Pet. at 36-37.)
11  However, the loss of the razor blade was ancillary to the expertise
12  provided by Leaver in determining that the pad belonged to Madsen.
13  Whether the blade was lost in the chain of custody does not change
14  the fact that Leaver determined the pad belonged to Madsen through
15  a  handwriting  comparison.   See  Woodson,  526  F.2d  at  551.
16  Furthermore,  Ulovec  cross-examined  Deputy  Efrain  Garcia,  the
17  investigator who testified as to the razor blade's chain of custody,
18  and questioned him specifically about the loss of the blade, and
19  whether it was tested for fingerprints prior to its loss.  (Supp.
20  Lodgment No. 12 at 272.)  Accordingly, it was reasonable for Ulovec
21  to conclude that cross-examination of Leaver on this same point was
22  redundant and unnecessary.

23      Madsen fails to show that Ulovec made unreasonable tactical
24  decisions when he chose not to cross-examine Leaver or to object to
25  the  handwriting  exemplar,  and  that  he  suffered  prejudice  due  to
26  Ulovec's actions.  See Strickland, 466 U.S. at 687. Therefore, the
27  California Supreme Court's denial of Madsen's ineffective assistance
28  of  counsel  claims  was  not  contrary  to,  or  an  unreasonable

application of, clearly established United States Supreme Court authority.

For the foregoing reasons, this Court **RECOMMENDS** that Ground 4 be **DENIED** as to the ineffective assistance of counsel claims challenging Ulovec's failure to call certain witnesses, impeach Solano, and challenge the handwriting experts.

**G.   Convictions Tainted by Juror Misconduct**

In Ground 6 Madsen contends that he was denied his Sixth Amendment right to an impartial jury and fair trial due to juror bias and misconduct. (Pet. at 45.) In particular, Madsen contends that juror Gary Darr ("Darr") withheld information about a prior conviction because he wanted to serve on the jury in order to 'get back' at Madsen for an alleged incident years before. (Id.) Madsen argues that despite the Court of Appeal granting his appeal on this ground and remanding for an evidentiary hearing, the trial court and prosecution violated his due process rights because they caused witness Robert Crowley to be unavailable, denied Madsen a public hearing, made it impossible for witness James Crowley to gain access to the hearing, and denied Madsen adequate access to an attorney on remand. (Id. at 50.)

In response, Respondent argues that Madsen has not shown that the Court of Appeal's decision was unreasonable, nor has he shown why the trial court was not entitled to believe Darr when he testified at the first hearing. (Answer at 37.) Madsen never presented proof in state court that he actually contacted Crowley, or that Crowley was ever on his way to San Diego, therefore the state court cannot be faulted for choosing to believe Darr who testified credibly and in person at the first new trial hearing.

1  (_Id_. at 38.)

2                          **First New Trial Hearing**

3          On November 9, 1998, Madsen filed a motion for a new trial

4  alleging juror misconduct claiming that juror Gary Darr knew Madsen

5  before trial, had fired a weapon at Madsen on one occasion, and

6  intentionally failed to disclose a previous felony conviction during

7  voir dire.   (Lodgment No. 3 at 8.)  On December 11, 1998, Darr

8  submitted a declaration which stated:

9          In January 1998, I was a juror in the trial of a
   defendant who was charged with an attack on another
10  inmate at the George Bailey Jail; having a razor blade
   in jail; and threatening a deputy.

11
          I was contacted by telephone on November 23,
12  1998, by Deputy District Attorney Paul Azevedo.  Mr.
   Azevedo told me he wanted to talk to me about my
13  service as a juror.  Mr. Azevedo told me I did not
   have to talk to him and if I did, it would be at a
14  place and time of my convenience.  I agreed to talk to
   Mr. Azevedo.

15
          During the jury selection process, I do not
16  recall the judge asking me if I had ever been
   arrested.  I never intentionally concealed that
17  information or any other information from the court.

18          At the time I sat as a juror, I did not know who
   the defendant was nor do I currently have any
19  recollection of knowing who he was.  I was not even
   aware he was from Bonita until after the trial was
20  over and I read about him in the newspaper.

21          If, years ago, I had some previous contact with
   the defendant, I do not recall it and therefore it
22  could not have been considered and was not considered
   by me and had absolutely no affect on me as a juror.
23  Likewise, the fact that I was arrested many years ago
   was not considered by me in performing my duties as a
24  juror nor did it affect me in performing my duties as
   a juror in this case.

25
          My decision as a juror in this case was based on
26  the evidence presented in court and nothing else.

27  (Lodgment No. 4 at 740-41.)

28  ///

                              -48-                    04cv1726 IEG (BLM)

1          On February 19, April 8, and April 21, 1999, the trial court
2    conducted hearings on the new trial motion and issue of possible
3    juror misconduct.  (Supp. Lodgment No. 12 at 653.)  Darr testified
4    at the hearing, stating that he was convicted of a felony in 1986,
5    but because the conviction was later changed to a misdemeanor and
6    then expunged, he believed it had been taken off his record and that
7    he "didn't have to talk about it anymore".  (Id. at 705-06.)

8          During the hearing, defense counsel stated that a key
9    witness, Robert Scott Crowley ("Crowley"), was on an airplane on his
10   way to testify at the hearing and requested that the trial court
11   continue the hearing until later that afternoon or the following day
12   to allow Crowley to testify.  (Id. at 689.)  Defense counsel
13   represented that Crowley would testify that Darr recognized Madsen
14   at trial, and that by voting to convict him, Darr was going to get
15   "the little bastard" for stealing Darr's marijuana plants many years
16   before. (Id. at 695.) Crowley did not appear at the hearing, and the
17   trial court declined to continue the hearing for Crowley's arrival,
18   finding after Darr testified that he was credible and denying
19   Madsen's new trial motion. (Id.)

20         Madsen raised this issue in his direct appeal, and the Court
21   of Appeal reversed and remanded on the juror misconduct issue,
22   directing the trial court to conduct an evidentiary hearing.
23   (Lodgment No. 3 at 44.)  In particular, the Court of Appeal found
24   that the trial court abused its discretion by not continuing the
25   hearing until Robert Crowley arrived, and directed the trial court
26   to allow Madsen to present Crowley's testimony and further cross-
27   examine Darr regarding his alleged bias against Madsen. Id.
28   ///

1                      **Second New Trial Hearing**

2           On remand, the trial court scheduled a hearing for August 8,

3    2001, which was continued to November to allow the defense to locate

4    Crowley.    However, Crowley proved impossible to find, despite

5    several months of effort by both the prosecution and the defense.

6    (Lodgment No. 4 at 5.) Furthermore, juror Darr was not present for

7    the second hearing because the prosecution erroneously believed that

8    Darr was only to testify after Robert Crowley testified.   (<u>Id</u>.)

9    Efforts to locate Darr at the time of the hearing were unsuccessful

10   so the trial court invited both parties to recite the questions they

11   would have asked Darr.   (<u>Id</u>.)  After hearing the proposed questions,

12   the trial court determined it could rule without Darr's testimony,

13   because he had testified during the first new trial hearing. (<u>Id</u>. at

14   9.)  The trial court again denied Madsen's new trial motion, finding

15   Darr to have been a credible witness, who did not knowingly conceal

16   his prior conviction from the court during voir dire and who

17   harbored no bias toward Madsen.   (<u>Id</u>. at 8-10.)

18                 **Impartial Jury and Fair Trial Claim**

19          Madsen again appealed, and the Court of Appeal affirmed the

20   trial court's findings holding there was no juror misconduct, and

21   even if Darr had committed misconduct, there was no evidence of

22   prejudice affecting Madsen's case. (Lodgment No. 5 at 13.)

23          In adjudicating this claim, the Court once again must "look

24   through" to the California Court of Appeal's opinion (Lodgment No.

25   5) because the California Supreme Court summarily denied Madsen's

26   petitions. (Lodgment No. 16.)  <u>See</u> <u>Ylst</u>, 501 U.S. at 801-06.

27   ///

28   ///

The Court of Appeal stated:

Initially, we note the record does not contain any evidence establishing that Crowley's failure to testify in 1999 was solely the result of the trial court's denial of a continuance.  The record contains only defense counsel's statement at the 1999 hearing that Crowley was then "in the air" on his way to San Diego from Oregon.  There was no declaration submitted at the 1999 or 2001 hearings to support this assertion.  Nor were any records (such as airplane tickets or reservations) presented to show that Crowley had, in fact, been on his way to San Diego at the time the trial court denied the continuance in 1999.

Moreover, Crowley's unavailability at the 2001 hearing was not the result of any "government action."  The trial court did not prevent Madsen from calling Crowley as a witness at the 2001 hearing.  The prosecutor did not prevent Madsen from calling Crowley at the 2001 hearing.  Indeed, the prosecutor made diligent efforts to locate Crowley.  Crowley's unavailability for the 2001 hearing was the result of Crowley's own actions in having moved his residence, using different names, and/or his unwillingness to be a witness.

Finally, we find no merit to Madsen's last argument that we should reject the trial court's finding that Darr was credible because it "was made in a vacuum of its own creation and cannot stand."  Madsen points out the finding was "made without the benefit of hearing from Crowley and [that] this Court specifically intended that the trial court consider Crowley's testimony before making any findings of credibility."  He further states that "[a] witness, even after vigorous cross-examination, may seem credible; however, his/her credibility can be destroyed by the testimony of a contrary witness."

To the extent Madsen may be suggesting that we mandated Crowley testify prior to any ruling by the trial court on remand, he is in error.  In our opinion we held only that "the trial court should conduct a more complete evidentiary hearing, including *allowing* Madsen to present the testimony of Crowley on his posttrial conversation with Darr and to further cross-examine Darr after Crowley's testimony." (*People v. Madsen*, *supra*, D03707, italics added.)  The trial court gave Madsen that opportunity. When Crowley did not testify, the trial court's credibility determination was necessarily limited to the record it had before it.  Based on that record, the court was entitled to (and indeed was directed by our prior

1      opinion) to make credibility findings.  The court was
       entitled to find Darr was a credible witness.  There
2      was no error here.

3  (Lodgment No. 5 at 11-13.)

4          Clearly established United States Supreme Court law holds

5  that "the remedy for allegations of juror partiality is a hearing in

6  which the defendant has the opportunity to prove actual bias."

7  Smith v. Phillips, 455 U.S. 209, 215 (1982). The determination of

8  whether an individual juror was biased against the defendant is a

9  factual determination that we presume correct in habeas corpus

10 proceedings under 28 U.S.C. 2254(d).  Patton v. Yount, 467 U.S.

11 1025, 1038 (1984); Hart v. Stagner, 935 F.2d 1007, 1014 (9th Cir.

12 1991).  The federal court has no license under Section 2254(d) "to

13 redetermine the credibility of witnesses whose demeanor has been

14 observed by the state trial court, but not by them." Marshall v.

15 Lonberger, 459 U.S. 422, 434 (1983).  The trial court's resolution

16 of credibility questions is entitled to special deference.  See

17 Patton, 467 U.S. at 1038.

18                    **Gary Darr was Credible**

19        Madsen's claim that his Sixth Amendment right to a fair and

20 impartial jury was violated by juror Darr's conduct is without

21 merit.  Viewing the trial court's credibility determination with

22 special deference, as the court must, the trial court did not err in

23 finding Darr credible at the first new trial hearing or the new

24 trial hearing on remand.  See Patton, 467 U.S. at 1038.  When Darr

25 testified at the first new trial hearing, he repeatedly stated that

26 he did not recognize Madsen at trial:

27       Q:   And at that time, while you were asked questions
            before serving as a juror, did you recognize the
28          defendant?

```
 1        A:   No, I didn't.

 2        Q:   Did he seem familiar to you in any way?

 3        A:   No.

 4        Q:   Did you recognize the name when the court read
               it. "Richard Eugene Madsen"?
 5
          A:   No.
 6
          Q:   As you sit here today, I'd ask you to take a
 7             look  at  the  gentleman  in  the  green  jail
               jumpsuit,  for  the  record,  Mr. Madsen.  Do you
 8             recognize him other than from your jury service?

 9        A:   No.

10   (Supp. Lodgment No. 12 at 702.)

11        In response to the prosecution's questioning, Darr explained

12   why he did not disclose his prior conviction:

13        Q:   Also  during  your  questions,  before  you  were
               actually  sworn  in  as  a  juror,  as  one  of  the
14             twelve jurors, do you remember the court asking
               you anything about prior criminal convictions?
15
          A:   No, I don't.
16
          Q:   And if the court had asked you, as a member of a
17             group or you as an individual, if you had any
               prior criminal convictions, do you know how you
18             would have answered that question?

19        A:   If  I  was  asked  individually,  I  don't  really
               remember.
20
          Q:   And is that because you took some action to
21             remedy the event, a criminal conviction from
               about ten years ago?
22
          A:   Yes, I did. I believe it was like 1985 or 1986.
23             I had a conviction and I went through the whole
               thing, did the time or whatever, paid the debt
24             back to society, and then went to my attorney
               and got it changed to a misdemeanor.
25
          Q:   And after it was changed into a misdemeanor, did
26             you  go  through  a  process  known  to  you  as
               "expungement"?
27
          A:   Yes, sir. I heard through my attorney that it
28             was taken care of.
```

1        Q:   What is your understanding?

2        A:   I thought it was taken off your record and, you
              know, it's basically a misdemeanor and therefore
3             you didn't really have to talk about it anymore.

4   (<u>Id</u>. at 705-06.)

5        The record reveals that Darr answered the prosecution's

6   questions in a straightforward and consistent manner, giving the

7   trier of fact no reason to doubt his credibility.   Darr testified

8   that he did not recognize Madsen at trial and did not intentionally

9   fail to disclose his prior conviction, and he explained why he did

10  not disclose his prior conviction, if he was asked.

11       In support of his motion for a new trial, Madsen presented a

12  declaration from James Crowley who stated he and Madsen grew up

13  together in Bonita, and that he remembered Darr as a neighbor who

14  shot at Madsen "for his belief that Mr. Madsen had stolen marijuana

15  from his back yard", and that Darr stated he would "get even" with

16  Madsen if he ever had the opportunity.   (Supp. Lodgment No. 17 at

17  704.)   Madsen also provided a declaration from John Dillon who

18  stated he had known Madsen since 1969, lived in the same

19  neighborhood and attended the same junior high school. (<u>Id</u>. at 706.)

20  Dillon stated that Darr was known as "Fat Dog" in the neighborhood

21  and that Dillon assumed it was Darr who shot at Madsen when Madsen

22  stole the marijuana plants from Darr's yard.   (<u>Id</u>.)   Madsen did not

23  present a declaration from Robert Scott Crowley as to his purported

24  testimony.

25       The court stated that it "thought long and hard about the

26  declarations attached to the moving papers and chose instead to

27  limit an inquiry of Mr. Darr to add additional information to the

28  declaration that he submitted to the court." (Supp. Lodgment No. 12

at 721) The court went on to state that it had "considered the totality of the circumstances of this case including the trial, keeping in mind [defense counsel's] proffer of Mr. Crowley's testimony", and determined that it was not necessary to bring Mr. Crowley before the court to testify. (Id. at 722-23) After observing Darr's demeanor on the stand, the trial court found Darr to be credible and denied Madsen's new trial motion. On remand the trial court affirmed its holding. (Supp. Lodgment No. 12 at 723.) Madsen has not presented evidence undermining the trial court's determination that even if it were to find Darr's conduct as a juror was willful, there was no reasonable probability of actual harm to Madsen. Smith, 455 U.S. at 215; Patton, 467 U.S. 1038. Furthermore, the trial court found Darr to be credible after observing Darr's demeanor on the stand, something this Court cannot do. Marshall, 459 U.S. at 434; Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500 (1984). Therefore, this Court defers to the trial court's credibility determination. Patton, 467 U.S. at 1038.

**Witnesses Were Not Made Unavailable by Court or Prosecution**

Furthermore, there is no merit to Madsen's claim that Robert Crowley was unavailable due to the trial court's denial of a continuance in the first new trial hearing, as there was never any evidence produced that Crowley was in fact "in the air" on his way to that hearing. Had the trial court continued the hearing until Robert Crowley appeared, the hearing may never have happened, as Robert Crowley could not be located. The trial court noted, "The People filed declarations detailing their efforts in locating Robert Crowley and submitted the declaration of John Buttitto, an investigator with the District Attorney's Office, detailing his

1  fruitless search for Mr. Crowley.  Defense counsel represented that

2  his efforts were similarly unsuccessful." (Lodgment No. 4 at 5.)

3  The Court of Appeal properly found that Crowley's absence from both

4  hearings was not due to any action taken by the court or government.

5      In addition, Darr was not made unavailable by the prosecution

6  for the second hearing as Madsen contends.  Rather, Darr was not

7  called to the second hearing because the prosecution wrongly

8  believed that Darr's testimony would only be required if Robert

9  Crowley testified, and because Crowley could not be located, the

10  prosecution did not call Darr.  The Court further finds there is no

11  merit to Madsen's argument that witness James Crowley was denied

12  admission to the R.J. Donovan facility where the second hearing was

13  held, because James Crowley (Robert's brother) was not called as a

14  witness for the second new trial hearing, and no other evidence was

15  presented requiring his presence.

16      Because the trial court properly determined juror Darr was

17  credible and had no bias toward Madsen, the Court of Appeal's denial

18  of this claim was not contrary to or an unreasonable application of

19  clearly established Supreme Court law.  <u>See</u> <u>Patton</u>, 467 U.S. at

20  1038; <u>Hart</u>, 935 F.2d at 1014.  For the foregoing reasons, the Court

21  **RECOMMENDS** that Ground 6 be **DENIED**.

22  **H.    <u>Violation of Miranda Warning</u>**

23      In Ground 7, Madsen argues that his Fifth Amendment rights

24  were violated because inmate Solano, an alleged government

25  informant, initiated discussions with him about the Cornejo assault

26  which led to Madsen making incriminating statements after Madsen had

27  invoked his right to counsel. (Pet. at 54.)  Madsen further argues

28  that Deputies Burke and Reynolds did not read him his Miranda

warning after the alleged terrorist threat against Bradburn, and therefore their testimony is "fruit of the poisonous tree." (Id. at 55.)  Because his attorney failed to move to suppress the testimony of these witnesses, Madsen further claims he suffered ineffective assistance of counsel. (Id. at 32.)

Respondent counters that Madsen's claim concerning Solano is more properly construed as a Massiah[14] claim, and should be denied because the record fails to show that the government did anything "designed deliberately to elicit incriminating remarks" citing Kuhlmann v. Wilson, 477 U.S. 436, 457 (1986).  (Answer at 38.) Respondent further contends that Madsen's right against self-incrimination was not violated when Bradburn, Burke and Reynolds failed to give him Miranda warnings after the terrorist threat incident because Madsen was not in custody, nor subject to interrogation, as required under Miranda.  (Id. at 39.)

Madsen did not raise this claim in his direct appeal, but raised it in his habeas corpus petition to the California Supreme Court which was silently denied. [Lodgment No. 16.]  Therefore, this Court must conduct an independent review of the record to determine whether the denial is contrary to, or an unreasonable application of, clearly established Supreme Court law.  Himes, 336 F.3d at 853.

## Massiah

Respondent correctly contends that Madsen makes a Massiah claim when he contends that the government asked Solano to elicit statements from Madsen to be used against him at trial.  Under Massiah and its progeny, to establish a Sixth Amendment violation of

---

[14]The government may not "deliberately elicit" incriminating statements from an accused after the right to counsel has attached.  Massiah v. U.S., 377 U.S. 201 (1964).

the right to counsel, a defendant must demonstrate that the government took some action which was designed deliberately to elicit incriminating remarks. See Massiah, 377 U.S. at 72-73; Kuhlmann, 477 U.S. at 459; McClesky v. Zant, 499 U.S. 467, 474 (1991)(applying Massiah to 28 U.S.C. §2254 habeas corpus claim); U.S. v. Henry, 447 U.S. 264, 273 (1980)(Massiah applies to jailhouse informant). The defendant must do more than show that an informant voluntarily reported the incriminating statements. See Kuhlman, 477 U.S. at 459.

In the present action, inmate Solano testified that Madsen came to his cell and asked Solano to testify falsely that Madsen was with Solano during the Cornejo assault (Supp. Lodgment No. 12 at 200), (2) asked Solano to pass an inculpatory jailhouse "kite" to another inmate (id. at 202-203), and (3) threatened Solano (id. at 209). Solano also testified that he asked Madsen "Why Cornejo?" and Madsen replied that Cornejo was "a piece of shit" and "got what he had coming." (Id. at 204-205.)

Solano's first contact with law enforcement regarding the Cornjeo incident was on April 24, 1994, the evening of the assault, when Solano was asked to give a statement about what he witnessed. (Supp. Lodgment No. 12 at 200.) A few days later, Solano was asked to provide Deputy Contreras with a written statement about the incident, which he did. (Id.) On April 26, 1997, Madsen came to Solano's cell and asked Solano to testify on his behalf that Madsen was watching TV with Solano at the time of the attack. (Id.) Solano's next contact with law enforcement came when Deputy Contreras escorted him to the infirmary and Contreras asked Solano if he knew anything more about the incident. (Id. at 201.) The

1    prosecutor asked:

2        Q:    Can you describe how you came into contact with
              the deputy?

3

4        A:    . . . I asked Mr. Contreras if he could take me
              to the infirmary because I thought I had a
              broken bone and he said, "Yes, I'll take you
5              immediately". And on my way down, he asked me if
              I knew anything about the Cornejo incident and I
6              told him, "Yes, I know more than I told I knew."
              And he said, "Do you want to talk about it? And
7              I told him, "Yes, I would like to talk about
              it."

8

9    (Id. at 201-202.)

10       When Solano returned to the Module, Madsen approached Solano

11   and asked him to pass the incriminatory "kite". (Id.) When asked

12   by the prosecutor what he did with the "kite" Solano stated "Well,

13   I thought I should call Deputy Contreras and show him this kite

14   since we'd just got done talking about this incident, and he told me

15   he would like to see it." (Id. at 204.)

16       The prosecutor did not ask Solano if he had any contact with

17   law enforcement prior to the attack, however it is clear from the

18   record that Solano's only contact with law enforcement during this

19   time period was to voluntarily report his knowledge of the attack

20   when asked and show the "kite" to Deputy Contreras. (Id. at 201-

21   202.) Madsen has not presented any facts or evidence indicating

22   that law enforcement directed or otherwise encouraged Solano to

23   interact with Madsen in an effort to elicit incriminating

24   statements. Madsen also has not established that Solano

25   deliberately elicited the incriminating statements. Rather, the

26   evidence established that law enforcement did not direct Solano to

27   take any action and that Madsen voluntarily approached Solano and

28   initiated the incriminating conversation. Therefore, Madsen has not

1  proven a <u>Massiah</u> violation. 377 U.S. at 72-73.

2                              **<u>Miranda</u>**

3        A suspect who is subject to custodial interrogation must be

4  advised of his federal constitutional right to remain silent and his

5  right to have an attorney present during questioning.  <u>Miranda v.</u>

6  <u>Arizona</u>, 384 U.S. 436 (1966). "[T]he term "interrogation" under

7  <u>Miranda</u> refers not only to express questioning, but also to any

8  words or actions on the part of the police (other than those

9  normally attendant to arrest and custody) that the police should

10 know are reasonably likely to elicit an incriminating response from

11 the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).

12       A prisoner is in "custody" if there is an additional

13 restriction on his freedom beyond what is normally experienced.  <u>See</u>

14 <u>U.S. v. Turner</u>, 28 F.3d 981, 983 (9th Cir. 1994); <u>Cervantes v.</u>

15 <u>Walker</u>, 589 F.2d 424, 428-429 (9th Cir. 1978).  To determine whether

16 a prison interrogation is custodial, the Court must consider four

17 factors focusing on additional restrictions on the prisoner: (1) the

18 language used to summon the prisoner; (2) the physical surroundings

19 of the interrogation; (3) the extent to which he is confronted with

20 the evidence of guilt; and (4) the additional pressure exerted to

21 detain the prisoner.  <u>Turner</u>, 28 F.3d at 983.

22       Here, the deputies never summoned Madsen, the conversations

23 between Madsen and the deputies took place while Madsen was in his

24 cell, no evidence was presented other than the discussion of the

25 threat made to Bradburn, and no pressure was exerted on Madsen in

26 any way. (Supp. Lodgment No. 12 at 315-324.)  In particular, Deputy

27 Burke testified that he was working with Bradburn on the day

28 Bradburn was threatened. (<u>Id</u>. at 318-19.)  According to Burke,

Madsen stopped him while he was making rounds and said he wanted to apologize to Bradburn. (<u>Id</u>.)  As the record reflects, Burke did not instigate the conversation, remove Madsen from his cell, or exert any pressure on Madsen to make a statement.  <u>Turner</u>, 28 F.3d at 983.

Similarly, Deputy Reynolds testified that he was briefed about the threat Madsen made to Bradburn.  (Supp. Lodgment No. 12 at 322-23.)   While walking the floor, Reynolds and Madsen spoke. Reynolds did not ask Madsen any questions, and described the conversation as follows:

> Q.   After you [and Deputy Burke] briefed, did you ever walk the floor in Floor B, the AD/SEG unit of the Central Detention Facility?
>
> A.   Yes.
>
> Q.   And did you have some contact with Mr. Madsen?
>
> A.   Yes, I did.
>
> Q.   Did he ask you some questions?
>
> A.   We basically had a conversation.  We talked about an incident that occurred with him and Deputy Bradburn.
>
> Q.   Did you tell Mr. Madsen anything about a report being written?
>
> A.   Yes, I did.  I told him that a crime report was being written. You know, I explained to him that he had threatened Deputy Bradburn and that he was writing a crime report.

(Lodgment No. 12 at 323.)

The record reflects that neither Deputy Burke nor Deputy Reynolds asked any questions or engaged in any conduct which they knew or should have known was reasonably likely to elicit an inculpatory response from Madsen.  <u>Shedelbower v. Estelle</u>, 885 F.2d 570, 573 (9th Cir. 1989) (citing <u>Innis</u>, 446 U.S. at 301 & n. 5). Morever, the record does not demonstrate that Madsen experienced any

further imposition on his freedom after he threatened Bradburn, and therefore, he was not in "custody" as contemplated by <u>Turner</u>.  <u>See</u> <u>Turner</u> 28 F.3d at 984; <u>Cervantes</u>, 589 F.2d at 428-429.  Because Madsen was not in "custody" and was not "interrogated" there was no <u>Miranda</u> violation.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444.

In light of the above, the California Supreme Court's silent denial of Madsen's <u>Massiah</u> and <u>Miranda</u> claims were not contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  Because the Court finds there is no merit to Madsen's <u>Massiah</u> and <u>Miranda</u> claims, his trial counsel's performance did not fall below an objective standard of reasonableness and he did not suffer any prejudice as a result of his trial counsel's failure to move for suppression of this testimony.  Accordingly, his right to effective assistance of counsel was not violated.  See <u>Strickland</u>, 466 U.S. at 696.  The Court therefore **RECOMMENDS** that Ground 7 be **DENIED**.

**I.    Prosecution's Failure to Disclose**

In Ground 8, Madsen argues that his due process rights were violated by the prosecutor's failure to disclose (1) that inmate Solano would testify that Madsen threatened him in October 1997 instead of August 1997 as allowed by the in limine ruling; and (2) that the razor blade extracted from the legal pad in Madsen's cell had been lost.  (Pet. at 59-60.)

Respondent counters that the prosecutor simply misstated that the threat to Solano occurred in August 1997, and this was insufficient to render Madsen's trial fundamentally unfair. (Answer at 42.)  Furthermore, Madsen does not show how the absence of the actual razor blade found in his legal pad demonstrates his

1  innocence, or how counsel could have capitalized on the loss to

2  change the result of the trial.  (Id. at 43.)

3       Madsen did not raise this claim on direct appeal, but raised

4  it in his petition for habeas corpus in the California Supreme Court

5  which silently denied the claim.  (Lodgment No. 16.)  Therefore,

6  this Court must conduct an independent review of the record to

7  determine whether the denial is contrary to, or an unreasonable

8  application of, clearly established Supreme Court law.  Himes, 336

9  F.3d at 853.

10      "[T]he suppression by the prosecution of evidence favorable

11 to an accused upon request violates due process where the evidence

12 is material either to guilt or to punishment, irrespective of the

13 good faith or bad faith of the prosecution."  Brady v. Maryland, 373

14 U.S. 83, 87 (1963).   The duty to disclose such evidence is

15 applicable even though there has been no request by the accused,

16 United States v. Agurs, 427 U.S. 97, 107 (1976), and the duty

17 encompasses impeachment evidence as well as exculpatory evidence,

18 United States v. Bagley, 473 U.S. 667, 676 (1985).  Such evidence is

19 material "if there is a reasonable probability that, had the

20 evidence been disclosed to the defense, the result of the proceeding

21 would have been different."  Id. at 682; see also Kyles v. Whitley,

22 514 U.S. 419, 433-434 (1995).

23                          **Solano's Testimony**

24      Contrary to Madsen's contention, the prosecutor did not fail

25 to disclose anything regarding Solano's testimony; rather, he simply

26 made a misstatement concerning the date upon which Madsen allegedly

27 threatened Solano.   Prior to trial, the prosecution made an in

28 limine motion to include evidence of Madsen's threat to Solano

1    explaining that the evidence was relevant to Solano's state of mind,
2    and to show that Madsen made attempts to fabricate and/or suppress
3    evidence. (Supp. Lodgment No. 12 at 126.) The crux of Madsen's
4    complaint rests on a misstatement by the prosecutor and trial court
5    during the in limine hearing concerning Solano's testimony, in which
6    the prosecutor and court repeatedly referred to an "August 1997"
7    threat, when in fact the threat was made in October 1997. (Supp.
8    Lodgment No. 12 at 127, 133, 135.)

9        Madsen does not argue that the evidence regarding the date of
10   the alleged threat was to be used for impeachment purposes, nor does
11   he state how the outcome of the trial would have been different had
12   the prosecutor not misstated the date. See <u>Bagley</u>, 476 U.S. at 676;
13   <u>Kyles</u>, 514 U.S. 433-434. It was the content of the threat as it
14   related to Solano's state of mind and Madsen's attempt to suppress
15   evidence, not the date of the threat, that was pertinent.
16   Therefore, Madsen has failed to show that there was any failure to
17   disclose.

18                          **<u>Razor Blade</u>**

19       Madsen also claims that the prosecution's failure to notify
20   him in a timely manner about the loss of the razor blade related to
21   Count 3 was prejudicial. (Pet at 59-60.) Madsen states that he did
22   not learn about the loss of the blade until the deputies testified
23   at trial on January 15 and 16, 1998. (Supp. Lodgment No. 12 at
24   263, 291.) Although not clearly stated, Madsen apparently
25   speculates that the razor blade may have had fingerprints belonging
26   to someone else on it and that he somehow may have capitalized on
27   that theory if he had been notified of the loss sooner. However,
28   Madsen's speculation is insufficient to support his legal theory.

1     The jury found Madsen guilty of possessing a sharp object in
2   violation of Penal Code section 4502 after hearing testimony from
3   the deputy who discovered the razor blade in the legal pad, the
4   investigator who handled the legal pad, and the handwriting expert
5   who determined the writing on the pad was Madsen's. (Supp. Lodgment
6   No. 12. at 231, 254, 281, 288.) Evidence is material only if "there
7   is a reasonable probability that, had the evidence been disclosed to
8   the defense, the result of the proceeding would have been
9   different." Bagley, 476 U.S. at 676; see also Kyles, 514 U.S at
10  433-434. Madsen has not established materiality here because even
11  if the razor blade had someone else's fingerprints on it (and
12  therefore someone else had touched it at some point in time), there
13  still was overwhelming evidence that Madsen was the last person to
14  possess the razor blade.

15     Because the Court finds that the testimony of multiple
16  witnesses was more than sufficient to establish the fact that Madsen
17  knowingly possessed a razor blade, Madsen has not established that
18  the prosecutor suppressed material evidence. Moreover, Madsen has
19  not established any prejudice resulting from the timing of the
20  government's notification of the loss of the razor blade.

21     For the foregoing reasons, the California Supreme Court's
22  denial of Madsen's claim was not contrary to, or an unreasonable
23  application of, clearly established United States Supreme Court law.
24  The Court accordingly **RECOMMENDS** that Claim 8 be **DENIED**.

25  **J.**     **Insufficient Evidence of Razor Blade in Count 3**

26     In Ground 9, Madsen argues that his due process rights were
27  violated because there was insufficient evidence to support his
28  conviction for Cal. Penal Code section 4502. Specifically, he

argues that since the government lost the razor blade, they could not and did not prove that he knowingly possessed a sharp instrument. (Pet. at 61.) Madsen further argues that his trial counsel was ineffective for failing to research and argue the nonexistence of the razor blade as a defense. (Id. at 34.)

Respondent counters that although the sheriff lost the razor blade when the notepad was sent from investigator Gonzalez to handwriting examiner Leaver for handwriting analysis, the claim should be rejected because a reasonable jury could conclude, based on testimony alone, that Madsen possessed a "sharp instrument" as required under California Penal Code section 4502. (Answer at 44.)

Madsen did not raise this issue on direct appeal, but raised it in his habeas corpus petition in the California Supreme Court which was silently denied. (Lodgment No. 16.) Because the state court did not "furnish a basis for its reasoning," this Court must conduct an independent review of the record to determine whether the denial is contrary to, or an unreasonable application of, clearly established Supreme Court law. Himes, 336 F.3d at 853.

When reviewing a due process claim of insufficient evidence, clearly established law requires that the court determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); Mikes v. Borg, 947 F.2d 353, 356 (9th Cir. 1991). The Court must view the evidence in the light most favorable to the prosecution and must presume the trier of fact resolved conflicting evidence in favor of the prosecution. Jackson, 443 U.S. at 319, 326; Juan H. v. Allen, 408 F.2d 1262, 1274 (9th Cir. 2005). ///

**Sufficiency of the Evidence**

At trial, Deputy Casillas testified that during a search of Madsen's cell on June 2, 1997, he discovered an accordion file containing papers belonging to Madsen and a legal pad. (Supp. Lodgment No. 12 at 281-84.) He stated that there was handwriting on the legal pad and that he found a razor blade hidden in the spine of the pad. (Id. at 283.) Casillas explained that when he found the razor blade he notified Deputy Golling and handed him the pad with the razor blade inside. (Id. at 284.) Casillas stated that the razor blade presented at trial as Exhibit 16 was the same size and shape as the one he found in the legal pad. (Id.) On cross-examination, Casillas acknowledged that the razor blade presented at trial was not the same razor blade he found, that the razor blade he found was not to his knowledge tested for fingerprints, and that there was no record that Madsen had been given, but had not returned, a disposable razor. (Id. at 284-286.)

Deputy Golling testified that after Deputy Casillas gave him the legal pad containing the razor blade, he immediately took the pad and razor blade and logged them into evidence, took Polaroid photographs of them, and locked them in an evidence locker. (Id. at 289-290.) On cross-examination, he stated that he later heard the razor blade was lost, and that as far as he knew, the razor blade had not been tested for fingerprints prior to its loss. (Id. at 291.)

Investigator Efrain Garcia testified that he retrieved the razor blade and legal pad from the evidence locker and delivered the pad to handwriting examiner Leaver for a handwriting analysis. (Id. at 263.) When he got it back, Garcia could not find the blade.

1    However, he testified that the blade in the legal pad was from a

2    disposable razor and was similar to Court's Exhibit 16, which also

3    was a blade taken from a disposable razor.  (<u>Id</u>. at 263-64.)   As

4    previously noted, Leaver testified that the writing on the pad was

5    Madsen's.  (<u>Id</u>. at 234-35.)

6         Viewing the evidence in the light most favorable to the

7    prosecution, as the Court must, a rational trier of fact easily

8    could determine from the combined testimony of Casillas, Golling,

9    Garcia, and Leaver that a razor blade was discovered in the spine of

10   a legal pad belonging to Madsen proving that Madsen possessed a

11   "sharp instrument" as required under Penal Code section 4502.   See

12   <u>Jackson</u>, 443 U.S. at 319, 326; <u>Taylor v. Stainer</u>, 31 F.3d 907,

13   908-09 (9th Cir. 1994).   Moreover, neither side is required to

14   produce all available evidence in a criminal trial and the jury was

15   so advised when the trial court gave them CALJIC 2.11.[15]

16        Madsen argues that even had a razor blade been found in his

17   possession, there is no evidence that it was in fact "sharp" as

18   required under Penal Code §4502.  (Pet. at 61.)  While there was no

19   evidence presented at trial regarding the particular sharpness of

20   the razor found in Madsen's legal pad, or the blade produced at

21   trial, the deputies testified that they observed the blade and that

22   it came from a disposable razor and was found in the spine of a

23   writing tablet.  (Supp. Lodgment No. 12 at 263-64, 283.)   Deputy

24   Garcia also testified that inmates regularly remove the metal blade

25   from disposable razors distributed to prisoners which they then bond

26   to toothbrush handles, or pens, to create weapons.  (<u>Id</u>. at 263-65.)

27   _____
         [15]The trial judge gave the jury CALJIC 2.11 which stated in pertinent part:
28   "Neither side is required to produce all objects or documents mentioned or
     suggested by the evidence." (Supp. Lodgment No. 12 at 452.)

1   From this evidence and viewing it in the light most favorable to the

2   prosecution, a reasonable juror could easily determine that the

3   blade possessed by Madsen was "sharp" as required by section 4502.

4       For the foregoing reasons, the California Supreme Court's

5   denial of this claim was not contrary to, or an unreasonable

6   application of, clearly established United Stateas Supreme Court

7   law.

8                    **Ineffective Assistance of Counsel**

9            Madsen further argues that he suffered ineffective

10  assistance of counsel because Ulovec failed to move for sanctions

11  against the prosecution for losing the razor blade, and for failing

12  to have it tested for fingerprints.  (Pet. at 34.)

13      Madsen raised this claim in his California Supreme Court

14  habeas corpus petition, however, in adjudicating this claim, the

15  Court once again must "look through" to the California Court of

16  Appeal's opinion (Lodgment No. 3) because the California Supreme

17  Court summarily denied Madsen's petition (Lodgment No. 16).  See

18  Ylst, 501 U.S. at 801-06. The Court of Appeal stated:

19          In response to Madsen's new trial motion, his
        trial counsel filed a declaration explaining his
20      decision not to move for sanctions:

21          "3. Regarding loss of the razor blade, in
        my opinion, *California v. Trombetta* (1984)
22      467 U.S. 479 covers the issue.  My
        understanding of the law is that for
23      sanctions to apply, the exculpatory value
        of the lost evidence must be apparent and
24      the defendant must make a showing of bad
        faith on the part of law enforcement. There
25      was nothing in the facts, as I knew them,
        to indicate this test could be met, and
26      that the loss was anything other than
        negligence on the part of the Sheriff's
27      Department."

28  ///

                              -69-                    04cv1726 IEG (BLM)

Madsen does not show that his trial counsel's decision not to move for sanctions was not a rational tactical decision.  On the contrary, it appears that his trial counsel weighed the facts as he knew them against applicable law and concluded that sanctions would not have been granted by the trial court had a motion been made.  Therefore, his trial counsel could rationally conclude that it would be a fruitless use of time and effort to pursue a sanctions motion against the prosecution for the loss of the razor blade.  Furthermore, Madsen does not show that the razor blade would have borne fingerprints of other persons and not his own fingerprints.  Even had the evidence been potentially exculpatory, Madsen does not show that the loss of the evidence was the result of bad faith rather than simple negligence or that the trial court would have granted sanctions against the prosecution.  Furthermore, Madsen does not show that it is reasonably probably he would have received a more favorable result had his trial counsel moved for sanctions.

(Lodgment No. 3 at 25-26.)

As set forth above, trial counsel correctly stated the applicable law for lost evidence.  Sanctions are not appropriate where the government's loss of evidence is not in bad faith. Trombetta, 467 U.S. 479, 488.  Here, Madsen has not established either prong.  While he hypothesizes that the blade may have contained the fingerprints of another person, no testing was done to confirm or dispute Madsen's theory.  As a result, the exculpatory nature of the blade was not readily apparent.  Id. at 489.  Even if it were, Madsen has not shown any bad faith on the part of the officers in losing the blade.  Accordingly, counsel made a reasonable tactical decision not to file a motion for sanctions and his representation was not deficient.  See Strickland, 466 U.S. at 687.  Even if the failure to file such a motion was deficient, Madsen has not established prejudice.  As explained above, there was overwhelming evidence establishing that Madsen possessed a sharp instrument as charged in Count 3.

1    Furthermore, prior to the substitute razor blade being

2    admitted into evidence, Ulovec argued that the razor blade should

3    not go to the jury because it was not the one allegedly found in

4    Madsen's cell. (Supp. Lodgment No. 12 at 327-328.) The trial judge

5    overruled Ulovec's objection and admitted the razor blade into

6    evidence. (Id.) Accordingly, Madsen's right to effective assistance

7    was not violated. See Strickland, 466 U.S. at 696.

8    In light of the above, the California Court of Appeal's

9    denial of Madsen's ineffective assistance of counsel claim in Count

10   3 was not contrary to, or an unreasonable application of, clearly

11   established United States Supreme Court authority. For the

12   foregoing reasons, the Court **RECOMMENDS** that Ground 9 be **DENIED**.

13   **K.    In Limine Rulings**

14   Madsen asserts multiple claims arising from the trial court's

15   in limine rulings. In Ground 10 Madsen argues that he was denied

16   due process and a fair jury trial because the trial court

17   erroneously granted the government's motion to permit Bradburn and

18   Solano to testify about subjects Madsen deems "highly prejudicial"

19   and to admit evidence about Madsen's possession in 1997 of other

20   sharp instruments. (Pet. at 63.) In Grounds 11 and 12, Madsen

21   contends that the prosecutor committed misconduct because he

22   exceeded the scope of the in limine rulings during his examination

23   of Solano and Bradburn. (Id. at 71, 75.) Madsen also contends his

24   right to effective assistance of counsel was violated because Ulovec

25   failed to adequately investigate and cross examine Bradburn

26   regarding past inmate threats and his knowledge of gangs. (Id. at

27   34.)

28   ///

1              **Bradburn's Testimony**

2          Madsen contends with regard to Count 4 (the terrorist threat

3    to Bradburn) that the trial court erred when it ruled that the

4    prosecution could introduce through Deputy Bradburn's testimony

5    erroneous and prejudicial evidence that Madsen was associated with

6    a prison gang and previously assaulted a prison official.  (Id. at

7    65-69.)  Madsen asserts that Bradburn got his information through

8    confidential informants and therefore it was hearsay and violated

9    Crawford v. Washington, 541 U.S. 36 (2004). (Id.)

10         Respondent counters that Madsen's Crawford claim must be

11   rejected because Crawford is not retroactive to this case, and that

12   therefore Madsen must prove that the evidence denied him due

13   process, which he has not done.  (Id. at 51.)  Respondent contends

14   that the evidence was introduced to show Bradburn's legitimate and

15   sustained fear, as required under California Penal Code section 422,

16   and that the trial court properly gave a limiting instruction to

17   ameliorate the potentially prejudicial nature of the evidence.

18   (Id.)  Moreover, Respondent notes that the trial court specifically

19   allowed Bradburn to testify that he knew Madsen assaulted Cornejo,

20   had been housed in Pelican Bay State Prison Special Housing Unit,

21   and was housed in Module 4B which is reserved for dangerous inmates.

22   Therefore, even if Bradburn misstated facts about Madsen's gang

23   affiliation or staff assaults while testifying, the misstatements

24   were minor and did not unduly prejudice Madsen.  Id.

25         Madsen did not raise this claim in his direct appeal, but did

26   raise it in his habeas corpus petition in the California Supreme

27   Court, which was summarily denied.  (Lodgment No. 16.)  Because the

28   state court did not furnish a basis for its reasoning, this Court

1   must conduct an independent review of the record to determine
2   whether the denial is contrary to, or an unreasonable application
3   of, clearly established Supreme Court law. <u>Himes</u>, 336 F.3d at 853.

**Gang Evidence**

5        After lengthy debate between the parties and court at the in
6   limine hearing, the trial court held that to demonstrate Bradburn's
7   'sustained fear' as required under California Penal Code section
8   422, Bradburn could testify "about his knowledge concerning where
9   Defendant had been housed and that he had been housed in 4B, that he
10  had previously been housed in the S.H.U. unit at Pelican Bay, that
11  he knew of assaultive conduct towards staff, that he knew that the
12  Defendant had stabbed an inmate" and "that he was aware that the
13  Defendant was associated with a particular gang." (Supp. Lodgment
14  No. 12 at 56, 59.)  Furthermore, the trial court insulated the
15  testimony by ruling that a limiting instruction proposed by the
16  prosecution would be given in light of the potentially prejudicial
17  effect of this testimony.  (<u>Id</u>. at 79.) In accordance with the in
18  limine ruling, the court read CALJIC 2.50, which instructed the jury
19  to consider the evidence only for the purpose of determining if
20  Madsen had the specific intent to make a threat and to determine if
21  Bradburn experienced sustained fear as a result of the threat. (<u>Id</u>.
22  at 451.)

23       Moreover, the trial court denied some of the prosecution's
24  requested in limine motions, ruling that certain evidence the
25  prosecution sought to introduce was inadmissible because it was
26  highly prejudicial, including any reference to the Aryan Brotherhood
27  and any information about an alleged incident in which the Hells
28  Angels contracted Madsen to kill a police officer.  (Supp. Lodgment

No. 12 at 59 and 70.)   As a result, the in limine ruling was carefully tailored to allow the prosecution to prove the "sustained fear" element required in Count 4, while unduly prejudicial evidence was excluded.   Through the trial court's considered efforts to limit any gang reference in Bradburn's testimony, the court ensured that Madsen received a fair trial as guaranteed under the federal constitution. <u>Estelle</u>, 502 U.S. at 70; <u>Spencer</u>, 385 U.S. at 554.

### Staff Assaults

Madsen argues that the trial court's in limine ruling allowing Bradburn to testify as to his knowledge of Madsen's prior staff assaults deprived Madsen of a fair trial under the federal constitution because he has no staff assaults in his record. (Pet. at 66-67.)

The trial court questioned the prosecution extensively during the in limine hearing concerning this point. (Supp. Lodgment No. 12 at 49-52.)   In particular, the court stated it was concerned that Bradburn had apparently received knowledge of Madsen's prior staff assaults through hearsay. (<u>Id</u>. at 51.)   However, the court also noted that Bradburn's testimony was relevant because it showed his state of mind, and that his perception however gleaned, went directly to a necessary element of Count 4.   (<u>Id</u>. at 52.)   As Madsen argues, the court stated it wanted more information about the subject before making a ruling.   (<u>Id</u>.)   However, the court ultimately ruled that the evidence was more probative than prejudicial despite no additional information being proffered on the issue.

The in limine ruling was properly limited to Bradburn's perception that Madsen had been assaultive to staff to show the

1    source of Bradburn's sustained fear.   The issue was not whether

2    Madsen had in fact assaulted staff, but whether Bradburn *thought*

3    Madsen had previous staff assaults to show that he legitimately

4    feared for his life after Madsen threatened him.   Moreover, any

5    potentially prejudicial effect was ameliorated by the court giving

6    CALJIC 2.50 which, as previously noted, advised the jury that it

7    could only consider the evidence as it related to Bradburn's state

8    of mind, and not as evidence of Madsen's guilt or innocence.  (Supp.

9    Lodgment No. 12 at 455.)   Accordingly, the inclusion of this

10   evidence did not render Madsen's trial fundamentally unfair and did

11   not violate his due process rights.   Estelle, 502 U.S. at 70;

12   Spencer, 385 U.S. at 554.

13        Because the in limine rulings concerning Bradburn's testimony

14   did not violate Madsen's due process rights, the California Supreme

15   Court's summary denial of this claim is not contrary to, or an

16   unreasonable application of, clearly established United States

17   Supreme Court law.   Accordingly, the Court **RECOMMENDS** this claim be

18   **DENIED.**

19                      **Prosecutorial Misconduct**

20        Madsen contends that the prosecutor exceeded the scope of the

21   trial court's in limine ruling when he elicited testimony from

22   Bradburn that Madsen was wearing green clothing which indicated he

23   was dangerous, was housed with the "worst of the worst", and that he

24   knew Madsen was "in" as opposed to "associated" with a certain

25   violent prison gang.  (Pet. at 73.)

26        Respondent counters that the prosecutor did not violate the

27   trial court's in limine rulings, and that the prosecutor's actions

28   did not render Madsen's trial fundamentally unfair citing Darden v.

                                 -75-              04cv1726 IEG (BLM)

1    _Wainwright_, 477 U.S. 168, 180-81 (1986).

2          To establish a claim of prosecutorial misconduct, a

3    petitioner must show:  (1) the prosecutor's actions amounted to

4    constitutional error and (2) the error was not harmless.  _Greer v._

5    _Miller_, 483 U.S. 756, 765-66 (1987).  In determining whether there

6    was constitutional error, the Supreme Court has stated that the

7    misconduct must have "so infected the trial with unfairness as to

8    make the resulting conviction a denial of due process."  _Darden v._

9    _Wainwright_, 477 U.S. 168, 181 (1986) (quoting _Donnelly v._

10   _DeChristoforo_, 416 U.S. 637, 643 (1974)); _see also_ _Thompson v. Borg_,

11   74 F.3d 1571, 1577 (9th Cir. 1996) (citing _Darden_, 477 U.S. at 168).

12   The "touchstone of due process analysis in cases of alleged

13   prosecutorial misconduct is the fairness of the trial, not the

14   culpability of the prosecutor."  _Smith v. Phillips_, 455 U.S. 209,

15   219 (1982).  The reviewing court must look at the trial as a whole

16   and place the prosecutor's remarks in context.  _See_ _Greer_, 483 U.S.

17   at 765-66.

18         Madsen did not raise this claim in his state petitions, and

19   therefore it has not been exhausted.  However, as the following

20   analysis shows, it is "perfectly clear" that these claims are

21   meritless, and therefore the Court may reject them.  28 U.S.C.

22   2254(b)(2); _Cassett_, 406 F.3d at 623-24.

23         Madsen has not demonstrated that the prosecutor exceeded the

24   scope of permissible testimony when Bradburn testified.  In order to

25   prove Count 4's terrorist threat charge the prosecution was required

26   to demonstrate Bradburn's state of mind when Madsen threatened him.

27   Cal. Penal Code § 422.  As noted above, the trial court allowed

28   Bradburn to testify that he was aware Madsen had been housed in unit

1  4B, that Madsen previously had been housed in the S.H.U. unit at

2  Pelican Bay, that he knew of Madsen's assaultive conduct towards

3  staff, that he knew that Madsen had stabbed an inmate and that

4  Madsen was "associated" with a particular prison gang.  (Supp.

5  Lodgment No. 12 at 56, 59.)

6  　　　　After Bradburn's testimony detailing Madsen's threat to kill

7  him, or have him killed by someone else, the prosecutor questioned

8  Bradburn about his state of mind at the time of the threat:

9  　　　　Q:   [H]ow did the threats to kill you from Mr.
               Madsen, accompanied with threats to have
10             somebody else do it if he couldn't do it, how
               did that make you feel?

11

12 　　　　A:   With what I knew about his reputation in the
               jails, I was nervous.

13 　　　　Q:   Were you afraid?

14 　　　　A:   Yes, sir.

15 　　　　Q:   You said with what you knew about Mr. Madsen.
               You knew Mr. Madsen was in 4B; is that right?

16

17 　　　　A:   Yes, sir.

18 　　　　Q:   What did that mean to you in the context of
               being concerned or afraid regarding the threat?
19             What does that mean when a person's in 4B?

20 　　　　A:   In 4B are our most violent inmates.  They lose a
               lot of rights being there.  If we bring them
21             out, they're escorted in chains when normal
               inmates just have their hands in their
22             waistband.  Just the clothing he was wearing.
               He had green clothing which is to tell staff
23             he's assaultive and dangerous.

24 　　　　Q:   Now, in addition to that, the fact he's in 4B
               and you believed all those factors to be part of
25             being in 4B, did you know anything about where
               Mr. Madsen had done prison time?

26 　　　　A:   Yes, sir, I knew he was down from Pelican Bay
               S.H.U. unit.

27

28 　　　　Q:   For those who aren't familiar with the penal
               system, in terms of your state of mind, what did

1          that mean to you, that you knew or believed Mr.
2          Madsen had done time in the Pelican Bay S.H.U.
           unit?

3    A:    Pelican Bay S.H.U. is special housing unit where
4          with all the state prisons, the worst of the
           worst inmates are housed at Pelican Bay.
5          They're escorted everywhere in chains, they're
           kept in solitary. And if you've ever toured a
6          state prison, the guards there wear protective
           gears at all times moving inmates because
7          they're considered that dangerous.

8                                        . . .

9    Q:    In addition to the fact that he was in 4B and
           the fact that you knew he had done time in the
10         Pelican - - or believed that he had done Pelican
           Bay S.H.U. time, had you heard anything about
11         assaults on inmates by Mr. Madsen?

12   A:    I knew he was back from the George Bailey
           Facility because he apparently stabbed another
13         inmate there.

14   Q:    And were you aware or did you believe in
           reference to your state of mind in perceiving
15         the threat, that Mr. Madsen had been assaultive
           towards staff?

16   A:    Yes, or we wouldn't have him in the green
           clothing.  I knew that he was in a prison gang
17         which is a violent gang, and the way we had him
           housed and moving him with chains, to keep them
18         all separate and protect us.

19   Q:    You knew or believed that the defendant was
           associated with a particular prison gang; is
20         that right?

21   A:    Yes, sir.

22   (Lodgment No. 12 at 245-247.)

23          As clearly demonstrated by the preceding testimony, the

24   prosecutor carefully narrowed the scope of each question to the

25   parameters allowed by the trial court's in limine ruling, focusing

26   the testimony on how each piece of evidence affected Bradburn's

27   state of mind.  The trial court specifically stated that "the deputy

28   will be allowed to testify as to what it *meant to him*, that [Madsen]

1  was in a special housing unit." (emphasis added) (Id. at 49.)

2  Bradburn's testimony merely described in detail the basis of his

3  fear, conveying the significance of the housing information,

4  clothing, and previous assaults to him.  When he slightly exceeded

5  the scope of the allowable testimony, making reference to Madsen

6  being "in" rather than "associated" with a gang, the prosecutor

7  immediately attempted to clarify Bradburn's volunteered testimony by

8  asking "You knew or believed that the defendant was associated with

9  a particular prison gang; is that right?" Id. at 247 (emphasis

10 added).  See Elliott v. Meyers, 691 F.Supp. 190, 192 (N.D. Cal.

11 1988)(no due process violation where witness volunteered information

12 about petitioner's violent history when prosecution immediately cut

13 it short).  As illustrated, the trial was not "infected" with

14 unfairness because the prosecutor did not exceed the scope of the

15 trial court's in limine rulings and the witness' misstatement, if

16 any, was minor.  See Greer, 483 U.S. 756, 765.

17        Moreover, the jury was given a limiting instruction which

18 noted that Bradburn's testimony regarding Madsen's association with

19 a prison gang was to be considered only for the purpose of

20 establishing whether Madsen had the specific intent to make a threat

21 and Bradburn was in sustained fear.[16]  The Court presumes jurors

22 follow jury instructions absent extraordinary situations; therefore,

23 the jury in this case did not consider Bradburn's testimony other

24 _____

25 [16]The court told the jury that "Certain evidence was admitted for a limited
   purpose.  Specifically, Deputy Bradburn testified about information he knew or
   believed about the Defendant.  Such evidence was offered for the purpose of
26 determining if the Defendant had the specific intent to make a threat and to
   determine if Deputy Bradburn was in sustained fear as a result of the information
27 and threat.  At the time this evidence was admitted, you were instructed it could
   not be considered by you for any purpose other than the limited purpose for which
   it was admitted. Do not consider this evidence for any purpose except the limited
28 purpose for which is was admitted." (Lodgment No. 12 at 452.)

1  than to show his state of mind. <u>Francis v. Franklin</u>, 471 U.S. 307,

2  324 n.9 (1985); <u>Hovey v. Ayers</u>, 458 F.3d 892, 913 (9th Cir. 2006).

3  Accordingly, Madsen's federal due process rights were not violated

4  by the prosecutor during Bradburn's testimony.

5  **<u>Ineffective Assistance of Counsel</u>**

6      Furthermore, Madsen's right to effective assistance of

7  counsel was not violated by Ulovec's failure to research Bradburn's

8  background or block testimony regarding whether Madsen was "in" as

9  opposed to "associated" with a violent prison gang.

10      During the pretrial in limine motion hearings, Ulovec

11  strenuously objected to the introduction of any gang evidence

12  arguing that it was highly prejudicial and there was sufficient

13  evidence of Bradburn's 'sustained fear' as required under section

14  422 without gang evidence. (Supp. Lodgment No. 12 at 58.) In its

15  ruling on the in limine motion, the trial court stated that in light

16  of Madsen's threat that someone else would kill Bradburn if Madsen

17  couldn't, a necessary "component of sustained fear is that someone

18  other than the defendant could carry it out, meaning that he had

19  some association, leading logically to what the officer knew about

20  the defendant's association with gangs." (<u>Id</u>.) When Bradburn

21  misstated that Madsen was "in" as opposed to "associated" with a

22  gang, the prosecutor quickly remedied the error, and it was

23  therefore reasonable for Ulovec to refrain from objecting. To do

24  otherwise may have highlighted the gang testimony for the jury,

25  which would not have benefitted Madsen. Accordingly, Ulovec's

26  representation was not deficient and Madsen has not demonstrated any

27  resulting prejudice.

28  ///

1    Ulovec also was not ineffective for failing to object to

2    Bradburn's testimony on the grounds that Bradburn was not qualified

3    to describe gang affiliation.  Madsen claims that Bradburn had no

4    specialized knowledge about gangs and therefore Ulovec should have

5    challenged his testimony that Madsen was in a "violent gang" because

6    was not an expert on gangs.  However, Madsen fails to show that

7    Bradburns' characterization of the Aryan Brotherhood was inaccurate,

8    nor how it would it have benefitted Madsen had Ulovec challenged

9    Bradburn's qualifications, and a recognized gang expert had been

10   called to testify as to the nature of the gang.

11   Finally, Madsen argues that Bradburn's personnel records

12   should have been inspected to see if he had a history of violent

13   propensities, citing Pitchess v. California, 11 Cal.3d 531, 534-538

14   (1974)(a defendant claiming self defense against a police officer

15   can request discovery of personnel records that might show violent

16   propensities). Madsen does not assert that he was assaulted by

17   Bradburn, nor that Madsen acted in self-defense, therefore the

18   protections provide by Pitchess and its progeny do not apply to

19   Madsen's claim. Id.

20   For the foregoing reasons, Madsen has not shown that Ulovec's

21   decision not to challenge Bradburn's testimony was unreasonable or

22   that he suffered prejudice as a result.  See Strickland, 466 U.S. at

23   687.  The California Court of Appeal's decision denying this claim

24   was not contrary to, or an unreasonable application of, clearly

25   established United States Supreme Court authority. Himes, 336 F.3d

26   at 853.

27   ///

28   ///

1                           **Solano's Testimony**

2           As to Counts 1 and 2 (the Cornejo assault), Madsen argues

3    that the trial court erred by ruling that Solano could testify about

4    an alleged threat Madsen made to Solano.  (Pet. at 63.)  Madsen

5    contends that the trial court allowed testimony regarding an alleged

6    "August" 1997 threat but Solano testified about a threat that

7    occurred in October 1997.  Madsen argues that he and Solano were not

8    in the same jail in August 1997, and that there is no evidence to

9    support Solano's statement about the threat in October 1997 other

10   than Solano's "bald assertion". (Id.  at 63.) Madsen further argues

11   that the trial court erred in allowing Solano to testify regarding

12   Madsen's prison gang activity because Solano had no personal

13   knowledge or expertise which qualified him to testify that Madsen

14   was in a prison gang. (Id. at 63-64.)

15          Respondent counters that the in limine ruling to which Madsen

16   refers was limited to the threat Madsen made to get Solano to recant

17   which showed evidence of Madsen's guilty conscience.  (Answer at

18   44.)  Respondent acknowledges that the trial court and parties

19   repeatedly referred to the threat as occurring in August 1997, but

20   that it was subsequently clarified during Solano's testimony that

21   the threat occurred in October 1997.  Respondent states that "it is

22   unclear how the mistake as to date affected anything, much less made

23   the trial unfair."  (Id.)  Respondent further argues that Solano's

24   testimony about Madsen's gang affiliation was not related to the

25   testimony covered by the in limine ruling. (Id. at 46.) In addition,

26   Solano was not offered as a gang expert, therefore Madsen's

27   arguments are meritless.  (Id.)

28   ///

Madsen did not raise this issue on direct appeal, but raised it in his habeas petition in the California Supreme Court, which was silently denied. (Lodgment No. 16.) Because the state court did not furnish a basis for its reasoning, this Court must conduct an independent review of the record to determine whether the denial is contrary to, or an unreasonable application of, clearly established Supreme Court law. <u>Himes</u>, 336 F.3d at 853.

Whether the improper admission of prosecution evidence amounts to a due process violation is a question of fundamental fairness. <u>Estelle</u>, 502 U.S. at 70; <u>Spencer v. Texas</u>, 385 U.S. 554 (1967). The question on federal habeas review is whether any error in the admission of evidence had a "substantial and injurious affect on the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

At the in limine hearing, the trial court ruled that Solano could testify that in August 1997, Madsen attempted to get Solano to recant statements which implicated Madsen in Cornejo's assault. (Supp. Lodgment No. 12 at 135.) The trial court held that the evidence was "not substantially more prejudicial than probative" as to a "very important issue in this case", because it was evidence of Madsen's consciousness of guilt. (Supp. Lodgment No. 12 at 135.) During the trial, Solano testified in accordance with the in limine ruling about Madsen's attempt to get him to recant his statements that implicated Madsen in Cornejo's assault (Lodgment No. 12 at 207-208.) However, Solano also clarified that the threat occurred in October 1997, not August as indicated during the in limine hearing. (<u>Id</u>.) Accordingly, the prosecution and Solano complied with the in limine rulings with merely a date correction. Madsen

1   has not demonstrated that the date correction resulted in a

2   fundamentally unfair trial.  <u>Estelle</u>, 502 U.S. at 70.  Moreover,

3   even if Solano's testimony was improperly admitted, the evidence and

4   testimony of numerous other witnesses provided sufficient support

5   for the jury to convict Madsen of Counts 1 and 2.

6        Contrary to Madsen's claim, Solano did not violate the courts

7   in limine ruling by testifying that Madsen was in a prison gang.

8   The in limine ruling related only to Madsen's attempt to get Solano

9   to recant his incriminating statements.  Solano did not mention

10   Madsen's gang affiliation during his testimony about Madsen's

11   efforts to get him to recant.  (Supp. Lodgment No. 12 at 209).

12   Accordingly Madsen suffered no substantial and injurious effect from

13   the admission of Solano's testimony concerning the threat.  <u>Brecht</u>,

14   507 U.S. at 637.

15        The California Supreme Court's denial of this claim was not

16   contrary to, or an unreasonable application of, clearly established

17   United States Supreme Court law.

18                  **Prosecutorial Misconduct**

19        In Ground 11, Madsen argues that the prosecutor committed

20   misconduct by exceeding the scope of the trial court's in limine

21   rulings when he posed questions to Solano to elicit testimony

22   concerning Madsen's gang association in violation of the trial

23   court's in limine ruling.  (Pet. at 71-77.)  According to Madsen,

24   the trial court "ruled that the prosecution would be limited to

25   testimony on the terrorist threat" in Count 4 including specific

26   evidence about Madsen's housing, and history of assaults. (<u>Id</u>.)

27   However, Madsen contends that the prosecutor asked Solano questions

28   which prompted Solano to testify that Madsen's motivation for the

1  attack was because "it's a game in the gang; mainline is out there
2  play[sic] gang games"; and that the prosecutor wrongly stated that
3  it was a fact that Madsen had threatened Solano in violation of the
4  in limine ruling, all of which created a spillover effect to Count
5  4.  (<u>Id</u>. 71-72.)

6      Respondent counters that the testimony from Solano was not
7  related to the terrorist threat for which the trial court issued the
8  in limine ruling, and therefore the claim should be denied.  (Answer
9  at 54.)

10      Madsen did not raise this issue on direct appeal, but did
11  raise it in his habeas petition in the California Supreme Court,
12  which was silently denied.  (Lodgment No. 16.)  Because the state
13  court did not furnish a basis for its reasoning, this Court must
14  conduct an independent review of the record to determine whether the
15  denial is contrary to, or an unreasonable application of, clearly
16  established Supreme Court law.  <u>Himes</u>, 336 F.3d at 853.

17      As a preliminary matter, the Court finds that the trial
18  court's in limine ruling concerning allowable references to Madsen's
19  gang activity was limited to Count 4, permitting Bradburn to testify
20  as to the basis of his fear at Madsen's threat. (Supp. Lodgment No.
21  12 at 56.)  A thorough examination of the record shows that the
22  portion of Solano's testimony to which Madsen refers concerned only
23  the Cornejo assault in Counts 1 and 2, not the terrorist threat in
24  Count 4.  The prosecution asked Solano what Madsen said when Solano
25  asked him why he had assaulted Cornejo.  (Supp. Lodgment No. 12 at
26  205.)  Solano responded that Madsen said he tried to be peaceful but
27  it didn't work, and that "it's a game in the gang that you've got to
28  follow orders or you're weak."  (<u>Id</u>.)  The prosecutor also asked

1   Solano to explain why he was testifying if he knew Madsen was in a

2   gang and dangerous, stating:

3          Q:   . . . And based on [your] criminal background,
                *the fact you've been threatened*, and the fact
4               that you told us what happens to a rat, why are
                you testifying in court today?
5
           A:   That could have been me that got sliced up like
6               that and if nobody tells, then it just keeps
                happening...
7

8   (Id. at 211.)(Italics added)

9          This testimony concerned only the attack on Cornejo in Counts

10  1 and 2, and the in limine ruling in question was limited to

11  Bradburn's testimony regarding gang evidence as it related to his

12  sustained fear for purposes of Count 4.   (Id. at 59, 74.)

13  Therefore, there is no merit to Madsen's argument that the

14  prosecution's questions to Solano exceeded the scope of the trial

15  court's in limine ruling.   Because this testimony was unrelated to

16  the in limine ruling made by the trial court, the prosecutor did not

17  commit misconduct.   Moreover, the gang references were minimal with

18  limited prejudicial effect.   The challenged testimony did not taint

19  the trial or render it fundamentally unfair in any respect. See

20  Darden, 477 U.S. 181.   Accordingly, the California Supreme Court's

21  silent denial of this claim was neither contrary to nor an

22  unreasonable application of clearly established United States

23  Supreme Court law.   Himes, 336 F.3d at 853.

24                  **Other Razors and L-Shaped Metal Piece**

25         In Ground 10 Madsen argues as to Count 3 that the trial court

26  erroneously allowed evidence of unaltered razors and an L-shape

27  piece of metal found in his possession to be introduced to show that

28  Madsen had knowledge of the razor blade hidden in his legal pad, and

1   that this evidence was prejudicial and known to "inflame jurors

2   emotions". (Pet. at 65.)

3        Respondent counters that the trial court properly ruled that

4   the unaltered razors and sharp piece of bent metal found in Madsen's

5   possession in 1997 could be admitted to show Madsen's awareness of

6   the contraband nature of the razor blade hidden in his legal pad,

7   and there was nothing particularly inflammatory about the evidence.

8   (Id. at 48.)

9        Madsen raised this claim in his direct appeal.  Because the

10   California Supreme Court summarily denied Madsen's petition

11   (Lodgment No. 16), this Court must look through to the last reasoned

12   state court decision which came from the California Court of Appeal

13   (Lodgment No. 3).

14        The Court of Appeal held:

15        We conclude the trial court did not abuse its
         discretion by admitting the other acts evidence.  A

16        reasonable trial judge could find that the probative
         value of that evidence outweighed its potential

17        prejudicial effect.  At trial Madsen contested the
         issue whether he knowingly possessed the razor blade

18        found hidden in the spine of the legal pad bearing his
         writing.  Madsen's other acts of possessing unaltered

19        razors and an L-shaped metal piece were probative
         evidence that he knowingly possessed the altered razor

20        blade in count 3, and a reasonable trial judge could
         conclude that its probative value outweighed any

21        potential prejudicial effect.  Furthermore, the trial
         court in this case minimized, if not eliminated, any

22        prejudicial effect of the evidence by giving a
         limiting instruction on the proper use of the

23        evidence.

24   (Lodgment No. 3 at 46-47.)

25        "[I]t is well-established that the fundamental fairness

26   guarantee of the Due Process Clause requires the prosecution to

27   prove beyond a reasonable doubt every element of the offense."

28   Estelle, 502 U.S. at 70, citing In re Winship, 397 U.S. 358, 364

1   (1970).  It also is well established that evidence of other crimes

2   is admissible to prove knowledge in certain circumstances provided

3   the   probative   value   of   the   evidence   outweighs   the   potential

4   prejudicial effect.  Fed.R.Ev. 404(b); U.S. v. Brown, 880 F.2d 1012,

5   1014 (9th Cir. 1989).

6       Madsen was charged in Count 3 with possession of a sharp

7   instrument by a prisoner. (Supp. Lodgment No. 17 at 2.)  During the

8   in limine hearing, the trial court determined that "the evidence is

9   offered to prove the issue of knowledge and that in this case, that

10  issue is in dispute." (Id. at 75.)  After hearing vigorous debate

11  on the probative versus prejudicial value of the evidence, the trial

12  court  held  that  the  evidence  was  material,  relevant  and  more

13  probative than it was prejudicial.  (Id. at 78.)  The trial court

14  further held that any potentially prejudicial effect could be offset

15  by the limiting instruction proposed by the prosecution. (Id.)  At

16  trial, the jury was instructed pursuant to CALJIC 2.50 that it could

17  consider the razors and L-shaped piece of metal as evidence for the

18  limited purpose of determining if it tended to show that Madsen had

19  knowingly  possessed  a  sharp  instrument  as  charged  in  Count  3.

20  (Supp. Lodgment No. 12 at 455.)

21      The evidence of other razors and the L-shaped piece of metal

22  was offered by the prosecution to prove the necessary element of

23  knowledge in Count 3.  See Estelle, 502 U.S. at 70.  Rather than

24  rendering  the  trial  fundamentally  unfair,  the  trial  court's  in

25  limine ruling and resulting limiting instruction ensured that the

26  government  could  only  use  Madsen's  prior  misconduct  to  prove  his

27  knowing possession of the charged contraband and not for any other

28  purpose.  It  is  presumed  that  the  jury  followed  the  limiting

instruction, and determined through the presentation of all of the evidence that Madsen knowingly possessed the altered razor blade in Count 3, thereby allowing them to convict him. See Estelle, 502 U.S. at 71-72.

In light of the above, the California Court of Appeal's decision denying this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. Himes, 336 F.3d at 853.

**L.     Jury Instructions**

In Ground 13, Madsen argues that the trial court violated his due process rights by instructing the jury with incorrect and flawed instructions. (Pet. at 78.)  In conjunction with this claim, Madsen contends in Ground 4 that he suffered ineffective assistance of counsel when Ulovec failed to submit appropriate instructions. (Id. at 37.)

Respondent first notes that Madsen raised no jury instruction claims on direct appeal, and that he only raised a claim as to CALJIC 7.38 in his habeas corpus petition to the California Supreme Court; therefore, the remainder of his claims are unexhausted. (Answer at 57.)  Despite Madsen's failure to exhaust, Respondent claims the Court can deny the unexhausted claims on the merits because it is "perfectly clear" that there is no merit to his claim that the instructions rendered the trial unfair under Estelle v. McGuire, 502 U.S. at 72.  (Answer at 57-62.)

A thorough review of the record reveals that Madsen has failed to exhaust his claims regarding CALJIC's 2.50, 1.21, 1.24, 2.11, 2.09, and 17.02.  However, for the reasons set forth below, this Court finds that it is "perfectly clear" that there is no merit

1  to the claims, and therefore the Court may address and deny these

2  claims.    28 U.S.C. § 2254(b)(2); Cassett, 406 F.3d at 623-624.

3  Because Madsen did not raise these claims to any state court, there

4  is  no  state  court  decision  to  which  this  Court  can  defer.

5  Accordingly, this Court must conduct a de novo review of his claims.

6  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2003).

7         Federal  habeas  relief  is  warranted  where  a  petitioner

8  establishes that the ailing instruction by itself "so infected the

9  entire trial that the resulting conviction violates due process."

10 Estelle, 502 U.S. at 71-72; see also Donnelly v. DeChristoforo, 416

11 U.S. 637, 643 (1974) (explaining that the challenged instruction

12 cannot  merely  be  "undesirable,  erroneous,  or  even  'universally

13 condemned'" — it must violate some constitutional right).    The

14 instruction may not be judged in artificial isolation, rather, it

15 must be considered in the context of both the instructions as a

16 whole and the trial record.    See Estelle, 502 U.S. at 72.    Estelle

17 presupposes that the jury instruction was somehow faulty under state

18 law.    See Estelle, 502 U.S. at 71-72.

19                            **CALJIC 2.50**

20         Madsen complains that instead of ameliorating the potentially

21 prejudicial effect of the razor blade and L-shaped piece of metal

22 found in Madsen's Vista jail cell in 1997, the limiting instruction,

23 CALJIC 2.50, made the jury focus on that evidence.    (Pet. at 80-81.)

24         Respondent  contends  that  Madsen's  claims  are  meritless

25 because CALJIC 2.50 specifically directs the jury to consider the

26 evidence only to show whether Madsen had knowledge of the nature of

27 the items in his possession as charged in Count 3.    (Answer at 59.)

28 ///

The prosecution requested the trial court give CALJIC 2.50 as a limiting instruction to offset any potentially prejudicial effect the "other act" evidence might cause, which the court did.[17]   The instruction was given during the trial immediately following the testimony of the deputies who found and documented the items, and was given again with all the jury instructions at the close of the trial.   (Supp. Lodgment No. 12 at 410, 455.)   The instruction explicitly directs the jury to consider the evidence only to determine whether Madsen had knowledge of the nature of the things in his possession in Count 3.   (Id. at 410.)   The trial court also told the jury that it had to weigh this evidence in the same manner as all the other evidence. (Id.)   The jury is presumed to follow its instructions, and Madsen provides no evidence that the jury misinterpreted the instruction.   See Estelle, 502 U.S. at 71-72.

To sustain a habeas corpus petition, Rule 2(c)requires a petitioner to point to a "real possibility of constitutional error." Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977).   Madsen has not pointed to any real possibility of constitutional error, but merely makes insufficient conclusory assertions that the instruction was misinterpreted.   Taken in the context of the trial as a whole, CALJIC 2.50 appropriately limited the jury's consideration of certain evidence.   See Estelle, 502 U.S. at 71-72.   Accordingly,

---

[17]The trial court accurately instructed the jury that "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.   Evidence was received pertaining to possession of certain items by defendant in the Vista Detention Facility.   This evidence, if believed, may not be considered by you to prove the defendant is a person of bad character or that he has a disposition to commit crimes.   It may be considered by you only for the limited purpose of determining if it tends to show: The defendant had knowledge of the nature of things found in his possession as charged in Count 3. For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case.   You are not permitted to consider this evidence for any other purpose." (Supp. Lodgment No. 12 at 455.)

1   Madsen has failed to show that CALJIC 2.50 was faulty under state

2   law or that its use so infected the trial that his due process

3   rights were violated. Id.

4                            **CALJIC 7.38**

5        Madsen raised his claim regarding CALJIC 7.38 in the

6   California Supreme Court which issued a postcard denial. (Lodgment

7   No. 16.)   Therefore, this Court must conduct an independent review

8   of the record to determine whether the denial is contrary to, or an

9   unreasonable application of, clearly established Supreme Court law.

10  Himes, 336 F.3d at 853.

11       Madsen contends that CALJIC 7.38, which states the elements

12  of Cal.Penal Code section 4502 as charged in Count 3 (possession of

13  sharp instrument), was ambiguous and allowed the jury to convict him

14  on count 3 for the possession of the items found at the Vista

15  Detention Facility rather than the razor blade found in his legal pad

16  at George Bailey Detention Center. (Pet. at 80-81.) Madsen further

17  argues that CALJIC 7.38 was separated by approximately thirty jury

18  instructions from the limiting instruction CALJIC 2.50 and was just

19  after CALJIC 3.30 regarding general criminal intent, and that

20  therefore CALJIC 2.50's ameliorating effect was lost. (Id. at 81.)

21       Respondent counters that the claim must fail because there is

22  no reasonable likelihood that the jury thought Count 3 involved any

23  allegations other than Madsen's possession of the razor blade in the

24  legal pad.   (Answer at 60.)

25       The Court agrees with Respondents contention that CALJIC

26  7.38[18] was unambiguous and clearly defined the elements of Count 3.

27  _____
       [18]The trial court correctly read CALJIC 7.38 as follows: "Defendant is
28  accused in Count Three of the Information of having violated section 4502 of the
                                                           (continued...)

1  When reviewing an allegedly ambiguous instruction, courts are
2  required to inquire "whether there is a reasonable likelihood that
3  the jury has applied the challenged instruction in a way" that
4  violates the Constitution. Boyde v. California, 494 U.S. 370, 380
5  (1990); Calderon v. Coleman, 525 U.S. 141, 146 (1998) (same). Here,
6  the jury received a limiting instruction at the close of the
7  testimony regarding the evidence collected at the Vista Detention
8  Facility which directed them to consider the evidence solely for the
9  limited purpose of determining if it tended to show that Madsen had
10 knowledge of the nature of things found in his possession as charged
11 in Count 3. (Supp. Lodgment No. 12 at 455.) Because jurors are
12 presumed to follow all jury instructions, the Court can safely
13 conclude that the jury limited its consideration of the evidence in
14 his possession in Vista to determine whether Madsen understood the
15 contraband nature of the razor blade in his legal pad in Count 3. See
16 Francis, 471 U.S. at 324 n.9.

17      Furthermore, there is no merit to Madsen's contention that
18 the ameliorating effect of CALJIC 2.50 was lost because it was given
19 approximately 30 instructions prior to CALJIC 7.38, or that CALJIC
20 3.30[19] regarding general criminal intent confused the jury into

21
[18](...continued)
22 Penal Code. Every person who, while being confined in, or being conveyed to or
   from any penal institution, or while under the custody of officials, officers or
   employees of any penal institution, possesses or carries upon his person or has
23 under her custody or control any sharp instrument or weapon, is guilty of a
   violation of Penal Code section 4502(a)(b), a crime." (Supp. Lodgment No. 12 at
24 463.)

25      [19]The trial court accurately read CALJIC 3.30 to the jury as follows: "In
   the crimes charged in Counts Two, Assault with a Deadly Weapon and Three,
26 Possession of a Sharp Instrument in a Penal Institution, there must exist a union
   or joint operation of act or conduct and general criminal intent. General
   criminal intent does not require an intent to violate the law. When a person
27 intentionally does that which the law declares to be a crime, he is acting with
   general criminal intent, even though he may not know his act or conduct is
28 unlawful." (Lodgment No. 12 at 459.)

1  believing that they could convict Madsen of Count 3 for his

2  possession of contraband found in his Vista Detention Facility cell.

3     First, the jury was instructed through CALJIC 2.50 that they

4  were to limit the use of the 1997 Vista jail evidence to evaluating

5  Madsen's knowledge for Count 3.  Second, they were instructed through

6  CALJIC 3.30 that they needed to find Madsen possessed general

7  criminal intent to convict him of Count 3.  Finally, CALJIC 7.38

8  defined the elements of Count 3's crime.  These three instructions,

9  in conjunction with CALJIC 1.01[20] which states that the instructions

10 are to be considered as a whole, gave the jury a clear roadmap for

11 their determination of Count 3.    There is no reasonable likelihood

12 that the jury convicted Madsen of Count 3 simply because he possessed

13 contraband at another time in another facility.  As previously noted,

14 the Court presumes that jurors follow their instructions, and Madsen

15 has provided no support suggesting that the jury applied the

16 instructions in a way that violates the Constitution, other than to

17 make conclusory assertions. See Estelle, 502 U.S. at 72. Accordingly,

18 the California Supreme Court's silent denial of this claim is not

19 contrary to, or an unreasonable application of, clearly established

20 United States Supreme Court law. For the foregoing reasons, the Court

21 **RECOMMENDS** that this claim be **DENIED**.

22                    **CALJIC 1.24 and 1.21**

23     In regard to Count 3, Madsen states that the court gave

24 CALJIC 1.24 which defines "possession" and CALJIC 1.21 which defines

25     [20]The trial court accurately read CALJIC 1.01 as follows: "If any rule,
   direction or idea has been repeated or stated in different ways in these
26 instructions, no emphasis was intended and you must not draw any inference
   because of its repetition.  Do not single out any particular sentence or any
27 individual point or instruction and ignore the others.  Consider the instructions
   as a whole and in light of all the others.  The order in which the instructions
   have been given has no significance to their relative importance." (Supp.
28 Lodgment No. 12 at 447.)

1    "knowledge", but argues that neither of these instructions require

2    that Madsen had *actual* knowledge of the object in his possession as

3    required under section 4502.  (Pet. at 83.) Therefore he concludes

4    that the jury was able to convict him of Count 3 based on his

5    constructive possession of the razor blade.  (Id.)

6        Respondent argues the claim must be denied because the court

7    instructed the jury that to convict Madsen of possessing a sharp

8    instrument, it had to find he "knowingly possessed" the instrument,

9    and a person cannot knowingly possess an instrument without being

10   aware of its presence.  (Answer at 60-61.)

11       Madsen's claim has no merit.  As Respondent notes, CALJIC

12   1.24[21] and 1.21[22], taken together, require that a person knowingly

13   exercise control over the requisite object, which in this case was

14   the razor blade.  A further instruction requiring the jury to find

15   that Madsen had actual knowledge of the razor blade would be

16   duplicative and unnecessary.  Madsen fails to show that the failure

17   of the trial court to give such an instruction so infected the trial

18   with unfairness that it violated his due process.  Estelle, 502 U.S

19   at 72.

20   ///

21   ///

22

23       [21]The trial court correctly instructed the jury regarding CALJIC 1.24 as
     follows: "There are two kinds of possession: actual possession and constructive
     possession.  Actual possession requires that a person knowingly exercise direct
24   physical control over a thing. Constructive possession does not require actual
     possession but does require that a person knowingly exercise control over or the
25   right to control a thing, either directly or through another person or persons.
     A person may have possession alone, or two or more persons together may share
     actual or constructive possession." (Supp. Lodgment No. 12 at 464.)

26

27       [22]The trial court accurately read CALJIC 1.21 as follows: "The word
     "knowingly" means with knowledge of the existence of the facts in question.
     Knowledge of the unlawfulness of any act or omission is not required.  A
28   requirement of knowledge does not mean that the act must be done with any
     specific intent." (Supp. Lodgment No. 12 at 464.)

1    **CALJIC 2.11**

2        Madsen contends that CALJIC 2.11 effectively tells the jury

3    that the prosecution does not have to produce the alleged razor

4    blade discovered in his legal pad, and thereby relieves the

5    prosecution of the burden of proof beyond a reasonable doubt.  (Pet.

6    at 83-84.)   He argues that this instruction violated the

7    Constitution by allowing him to be convicted of possessing a sharp

8    object despite the loss of the razor blade.  (Id.)

9        Respondent argues that Madsen has failed to show that the

10   Constitution prohibits conviction of possessory offenses unless the

11   contraband itself is brought to court.  (Answer at 61.)   Further,

12   Madsen has failed to show that it was fundamentally unfair to base

13   his conviction for possessing a razor blade on testimony that he

14   possessed it.  (Id.)

15       CALJIC 2.11 states that "neither side is required to produce

16   all objects. . .mentioned or suggested by the evidence." Despite

17   exhaustive research, this Court has found no case which challenges

18   the constitutionality of this instruction.[23]  Moreover, as the Court

19   discussed in Section I above, the trial testimony of numerous

20   individuals provided sufficient evidence for the jury to find Madsen

21   knowingly possessed a sharp instrument as charged in Count 3.  See

22   Order, Section I, at 63.  Madsen fails to show it was fundamentally

23   unfair to base his conviction for possessing the razor blade in

24   Count 3 on testimony that he possessed it. Estelle, 502 U.S. at 72.

25   Furthermore, Madsen has not demonstrated that CALJIC 2.11 was faulty

26

27           [23]The trial court accurately gave CALJIC 2.11 as follows: "Neither side is
     required to call as witnesses all persons who may have been present at any of the
     events disclosed by the evidence or who may appear to have some knowledge of
     these events.   Neither side is required to produce all objects or documents
28   mentioned or suggested by the evidence. (Supp. Lodgment No. 12 at 452.)

1  under state law.  Id.

2                       **CALJIC 2.09**

3        Madsen claims that CALJIC 2.09 impermissibly allowed the jury

4  to consider inadmissible hearsay statements concerning Madsen's

5  character, alleged gang association, and past staff assaults in

6  determining whether Madsen had the specific intent required to put

7  Bradburn in sustained fear as required under California Penal Code

8  § 422[24]. (Pet. at 86.)

9        Respondent argues that the claim must be denied because

10  CALJIC 2.09 limited the use to which the jury could put the evidence

11  regarding Madsen's character for violence and his gang connections.

12  (Answer at 62.)  As to Madsen's allegations that the element of

13  sustained fear was not sufficiently demonstrated to support a

14  conviction, Respondent notes that Bradburn testified about his fear,

15  and that he continued to be fearful after the threat, so much so

16  that he wrote Madsen up for a felony.  (Id.)

17        Through CALJIC 2.09[25] the jury was admonished to consider the

18  

---

19        [24]The trial court accurately instructed the jury regarding Cal.Penal Code
    section 422 as follows: "Every person who willfully threatens to commit a crime
20  which will result in death or great bodily injury to another person, with the
    specific intent that the statement is to be taken as a threat, even if there is
    no intent of actually carrying it out, which threat on its face and under
21  circumstances under which it is made, is so unequivocal, unconditional,
    immediate, and specific as to convey to the person threatened, a gravity of
22  purpose and an immediate prospect of execution of the threat, and thereby causes
    that person reasonably to be in sustained fear for his or her own safety or for
23  his or her immediate family's safety, is guilty of a violation of penal code
    section 422, a crime. (Supp. Lodgment No. 12 at 464-465.)

24        [25]The trial court correctly read CALJIC 2.09 to the jury as follows:
    "Certain evidence was admitted for a limited purpose.  Specifically, Deputy
25  Bradburn testified about information he knew or believed about defendant.  Such
    evidence was offered for the purpose of determining if defendant had the specific
26  intent to make a threat and to determine if Deputy Bradburn was in sustained fear
    as a result of the information and threat.  At the time this evidence was
    admitted you were instructed it could not be considered by you for any purpose
27  other than the limited purpose for which it was admitted.  Do not consider this
    evidence for any purpose except the limited purpose for which it was admitted."
28  (Supp. Lodgment No. 12 at 452.)

potentially inflammatory testimony Bradburn provided regarding his knowledge of Madsen's history of violence and gang association only to show that Bradburn was reasonably fearful of the seriousness of Madsen's threat, and that he continued to be in fear after the threat occurred.

Madsen argues that Bradburn's testimony regarding Madsen's history of staff assaults is false, that Bradburn had no personal knowledge about Madsen's gang affiliation, or the assault on Cornejo, therefore Bradburn's testimony was inadmissible hearsay. (Pet. at 85-86.)  On the contrary, Bradburn testified about his personal feelings and why he believed Madsen's threat.  Bradburn was not testifying based on inadmissible hearsay; he was explaining what facts and beliefs about Madsen made Bradburn feel afraid.  (Supp. Lodgment 12 at 247.)  As the limiting instruction explained, Bradburn's testimony was not offered for the truth of the matter asserted (and therefore was not inadmissible hearsay) but was offered solely to explain and establish Bradburn's sustained fear.

CALJIC 2.09 was not ambiguous or vague as to its purpose and direction because it specifically addressed the substance of Bradburn's testimony and directed the jury to use it only for the limited purpose to show Bradburn's legitimate and sustained fear at Madsen's threat. Estelle, 502 U.S at 72. Judging the instruction in the context of the trial record, Penal Code section § 422, and the limiting instruction itself, there is no reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution. See Estelle, 502 U.S. at 72; Boyde v. California, 494 U.S. at 380.

///

**CALJIC 17.02, 3.30 and 3.31**

Madsen argues that because Counts 1 and 2 (the Cornejo attack) were joined with Count 3 (possession of razor blade) and Count 4 (terrorist threat), jury instructions were given which confused the jurors and created a spillover effect of evidence from one crime to other crimes.  Specifically, Madsen contends that CALJIC 17.02 instructs the jury to decide each count separately, but CALJIC 3.30, given regarding Counts 2 and 3, requires the jury find "a union or joint operation of act" in addition to general criminal intent, which confused the jury and allowed them to consider the evidence of one set of offenses as evidence establishing the other. (Pet. at 88-89.)  Similarly, Madsen argues that the trial court gave CALJIC 3.31 with respect to Counts 1 and 4, which required the jury find "a union or joint operation of act or conduct" and specific criminal intent, and allowed the jury to apply evidence from one count to another.  (Id.)

Respondent counters that the claim must be denied because "[n]o reasonable jury would interpret an instruction saying that for any given offense intent must be joined with action to mean that evidence of offense A applied to offense B." (Answer at 63.)

The Court finds no ambiguity or potential confusion in the trial court's instructions.  CALJIC 17.02[26] clearly states that the jury must "decide each Count separately".  The fact that the court

---

[26]The trial court correctly stated CALJIC 17.02 to the jury as follows: "Each Count charges a distinct crime.  You must decide each Count separately. The defendant may be found guilty or not guilty as to any or all of the crimes charged.  Your finding as to each Count must be stated in a separate verdict." Lodgment No. 12 at 466.

instructed the jury that CALJIC 3.30[27] applied to Counts 2 and 3, and that CALJIC 3.31[28] applied to Counts 1 and 4 did not permit a prejudicial "spillover" of evidence.  Rather, when considered as a whole, the instructions directed the jury to decide each crime independently and provided the specific elements required for each crime.  Madsen may not arbitrarily select specific instructions, while ignoring others, in an attempt to manufacture error.  Estelle, 502 U.S. at 72 (instructions may not be judged in artificial isolation but must be considered as a whole).

## Ineffective Assistance of Counsel

Madsen's ineffective assistance of counsel claim regarding Ulovec's failure to submit appropriate jury instructions similarly fails.  Madsen specifically claims that Ulovec rendered deficient performance for failing to submit an instruction on third party culpability as to Counts 1, 2 and 3, and an imminent threat instruction as to Count 4.  (Pet. at 37.)  However, Madsen does not show the relevance of either of these instructions, nor does he demonstrate any facts which would support their inclusion.  Instead, the record reflects that Ulovec requested numerous jury instructions, including CALJIC 2.20 "Believability of Witnesses" and

---

[27]As noted above, the trial court accurately read CALJIC 3.30 to the jury as follows: "In the crimes charged in Counts Two, Assault with a Deadly Weapon and Three, Possession of a Sharp Instrument in a Penal Institution, there must exist a union or joint operation of act or conduct and general criminal intent. General criminal intent does not require an intent to violate the law.  When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know his act or conduct is unlawful."  (Lodgment No. 12 at 459.)

[28]The trial court accurately gave the jury CALJIC 3.31 as follows: "In the crimes charged in Counts One and Four, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator.  Unless the specific intent exists the crime to which it relates is not committed.  The specific intent required is included in the definitions of the crimes set forth elsewhere in these instructions." (Supp. Lodgment No. 12 at 460.

1   CALJIC 2.60 "Defendant Not Testifying- - No Inference of Guilt May

2   be Drawn", which the court accepted.  Of the instructions requested

3   by Ulovec, only one was rejected.[29]  Furthermore, because the jury

4   instructions as given were not prejudicial to Madsen's case, Ulovec

5   was not unreasonable for failing to object to them. Strickland, 466

6   U.S. at 687.  The Court therefore **RECOMMENDS** that his ineffective

7   assistance of counsel claim be **DENIED.**

8                    **Erroneous Denial of Defense Instruction**

9        Madsen argues that the trial court erred in rejecting a jury

10  instruction favorable to the defense which directed the jury to

11  consider the "obvious 'fact' the authorities and the prosecution

12  were in collusion, willfully suppressing the evidence related to

13  Count Three." (Pet at 84.)  Respondent counters that the evidence

14  at trial was that the loss of the razor blade was accidental and

15  therefore Madsen fails to show how the court's refusal to instruct

16  the jury that the prosecution had willfully suppressed the blade

17  rendered his trial fundamentally unfair.  (Answer at 61.)

18       Madsen raised this claim in his habeas corpus petition to the

19  California Supreme Court which denied it without citation to

20  authority. (Lodgment No. 16.) Therefore, this Court must conduct an

21  independent review of the record to determine whether the denial is

22  contrary to, or an unreasonable application of, clearly established

23  Supreme Court law. Himes, 336 F.3d at 853.

24       The Court finds no merit to Madsen's contention that the

25  trial court rejected a jury instruction favorable to the defense

26  concerning the "obvious" fact that the authorities and the

27       [29]The trial court rejected Ulovec's proposed jury instruction concerning
28  suppression of evidence by the police or prosecution in regard to the lost razor
    blade. (Lodgment No. 17 at 403-404.)

1   prosecution were in collusion and willfully suppressed the razor

2   blade in Count 3.  The trial testimony of investigator Efrain Garcia

3   demonstrated that the loss was accidental.  (Supp. Lodgment No. 12

4   at 263.)  Madsen has not presented any evidence indicating that

5   Garcia's testimony was false or that the government intentionally

6   lost the blade.  Accordingly, Madsen fails to show how the jury

7   instructions violated his constitutional rights as required under

8   Estelle, 502 U.S. at 72.  For the foregoing reasons, the Court

9   finds that there is no merit to Madsen's multiple claims regarding

10  jury instructions, and the California Supreme Court's denial of his

11  claim regarding CALJIC 7.38 was not contrary to clearly established

12  federal law, and **RECOMMENDS** that Madsen's Petition be **DENIED** on

13  Ground 13.

14  **M.**   **Use of 1984 Prior as Strike**

15       Madsen argues in Ground 14 that his Fourteenth Amendment

16  rights were violated by the use of a 1984 assault prior as a strike

17  for purposes of the Three Strikes law.  (Pet. at 90.)  In

18  particular, Madsen contends that as a part of the plea agreement he

19  entered in 1984, the great bodily injury allegation would be

20  dropped, and that therefore the prior conviction cannot be

21  considered "serious" within the meaning of the Three Strikes Law.

22  (Id.)  Madsen claims that the prosecution's decision in the present

23  case to elevate the prior conviction to a serious felony is a

24  defacto violation of contract principles and collateral estoppel.

25  (Id. at 89-90.)  In addition, in Ground 4 Madsen claims he suffered

26  ineffective assistance of counsel because Ulovec failed to raise the

27  fact that the 1984 plea agreement transcripts were destroyed, object

28  to the amended information regarding the 1984 prior, object to the

1  admission of the preliminary hearing transcripts, and object to jury

2  instructions elevating said prior to a serious felony for strike

3  purposes. (Id. at 38.)

4       Respondent counters that Ground 14 should be denied for

5  failure to present a federal question because the Court of Appeal

6  decision on this claim was a statement of the meaning of California

7  law and it is the state court's role to determine state law. (Answer

8  at 65.)   As to the ineffective assistance of counsel claim,

9  Respondent argues that the prior conviction was properly treated as

10 a strike, and Madsen has not clearly stated what the problem was

11 with the strike prior, nor what counsel's actions should have been,

12 and therefore has failed to sustain his burden and the court should

13 deny his claim. (Id. at 28-29.)

14                **Violation of 1984 Plea Agreement**

15      Ground 14 does not present a cognizable federal claim.   To

16 present a cognizable federal habeas corpus claim under § 2254, a

17 state prisoner must allege both that he is in custody pursuant to a

18 "judgment of a State court," and that he is in custody in "violation

19 of the Constitution or laws or treaties of the United States."  See

20 28 U.S.C. § 2254(a).  Federal habeas review is not available for an

21 alleged error in the interpretation or application of state law.

22 Estelle, 502 U.S. at 67-68.

23      The sum of Madsen's federal due process claim is as follows:

24 "The use of a 1984 prior as a strike was violative of due process,

25 contract, and equitable principles U.S.C. 14th." (Pet. at 90.)  This

26 cursory reference to the violation of his federal due process rights

27 is insufficient to maintain a federal due process claim. Rule 2(c),

28 28 U.S.C. foll. § 2254.  See also Boehme v. Maxwell, 423 F.2d 1056,

1058 (9th Cir. 1970) (trial court's dismissal of federal habeas
proceeding affirmed where petitioner made conclusory allegations
instead of factual allegations showing that he was entitled to
relief).  Moreover, the Court's review of Madsen's petition reveals
that he is arguing that California state law prohibited the trial
court from considering his prior conviction as a strike for
sentencing purposes.  (Pet. at 90-91.)  This is a state law claim
which was properly adjudicated by the state courts.  <u>Estelle</u>, 502
U.S. at 67-68.

Because Madsen has not articulated a specific federal
violation and his stated claim is based on an alleged violation of
California law which the Court of Appeal properly addressed, he is
not entitled to federal habeas relief and the Court **RECOMMENDS**
Ground 14 be **DENIED**.

### Ineffective Assistance of Counsel

Furthermore, Madsen has failed to show that Ulovec's
performance was deficient, and that his performance prejudiced the
defense.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687.  Madsen raised this
ineffective assistance claim in the California Supreme Court which
issued a postcard denial.  (Lodgment No. 16.)  Therefore, this Court
must conduct an independent review of the record to determine
whether the denial is contrary to, or an unreasonable application
of, clearly established Supreme Court law.  <u>Himes</u>, 336 F.3d at 853.

Madsen's 1984 assault offense involved both personal
infliction of great bodily injury and  personal use of a dangerous
or deadly weapon. (Lodgment No. 3 at 52.)  "The preliminary hearing
transcript shows the victim and two other witnesses testified that
Madsen used a baseball bat to beat the victim and inflict serious

1  injuries on him, including a broken nose, lacerations on his nose
2  requiring five stitches, bruises to his body and forehead, and
3  numbness on parts of his face." (Id.) Under the California Three
4  Strikes Law, a prior conviction counts as a strike if it is
5  "serious" or "violent" within the meaning of California Penal Code
6  section 1172.7(c). Cal. Penal Code. §§ 667(a)(4), 667(d)(1). At the
7  time of Madsen's present offenses, California Penal Code section
8  1192.7 provided that serious or violent felonies include those where
9  the defendant inflicts great bodily injury (§1192.7(c)(8)) and where
10 the defendant personally uses a dangerous or deadly weapon
11 (§1192.7(c)(23)), both of which were alleged in the 1984 assault.
12 (Supp. Lodgment No. 12 at 49.) The 1984 plea agreement resulted in
13 the dismissal of the section 12022.7 allegation (personal infliction
14 of great bodily injury). (Id.)

15     The 1984 assault properly could be considered a strike
16 whether the great bodily injury enhancement was incorporated at the
17 time of the plea agreement or not, because Madsen's undisputed use
18 of a baseball bat in the assault provided an independent basis for
19 strike classification. People v. Reed, 13 Cal.4th 217, 221
20 (1996)(use of prior conviction as serious felony upheld where
21 preliminary hearing transcript showed defendant personally used a
22 deadly weapon in previous assault, despite plea agreement and no
23 information allegation or finding in the prior case that defendant
24 personally used a deadly weapon). The Court of Appeal held that
25 "Madsen's 1984 conviction therefore was properly considered a strike
26 under the three strikes law and the trial court did not err by
27 refusing to strike that allegation." (Lodgment No. 3 at 53.)
28 ///

1       Ulovec's failure to object to the amended information which
2   classified the 1984 prior as a serious felony was not unreasonable
3   in light of the fact that the prior assault could be considered
4   serious whether the great bodily injury allegation was included or
5   not.  See Reed, 13 Cal.4th at 221.  Similarly, Ulovec's failure to
6   object to the admission of the preliminary hearing transcripts and
7   the jury instructions regarding the 1984 prior was not unreasonable
8   and did not cause Madsen any prejudice as there existed sufficient
9   grounds to consider the prior assault a serious felony for purposes
10  of the Three Strikes law.  As to Madsen's contention that the 1984
11  change of plea and sentencing transcripts were destroyed, there is
12  no evidence in the record that these documents were in fact
13  destroyed, and Madsen does not elaborate.  Therefore, Madsen has not
14  established that Ulovec's failure to challenge the use of the 1984
15  conviction as a strike fell below an objective standard of
16  reasonableness or prejudiced him.  Strickland, 466 U.S. at 688.

17      For the foregoing reasons, the state court's denial of
18  Madsen's ineffective assistance of counsel claim regarding the 1984
19  prior was not contrary to, or an unreasonable application of,
20  clearly established Supreme Court law.  Williams, 529 U.S. at 412-
21  13. Accordingly this Court **RECOMMENDS** that the portion of Ground 4
22  concerning the strike effect of the 1984 assault conviction be
23  **DENIED.**

24  **N.**    **Ineffective Assistance of Appellate Counsel**

25      Madsen argues that his first and second appellate attorneys
26  failed to argue all the issues raised in the current petition on
27  appeal.  (Pet. at 38-39.)

28  ///

1   Respondent counters that the claim must be denied because
2   Madsen fails to state what harm resulted from his appellate
3   attorneys' respective failures. (Answer at 29-30.)

4   Madsen did not raise this issue on direct appeal, however he
5   did raise it in his California Supreme Court habeas corpus petition
6   which was silently denied. (Lodgment No. 16.) Because the state
7   court did not furnish a basis for its reasoning, this Court must
8   conduct an independent review of the record to determine whether the
9   denial is contrary to, or an unreasonable application of, clearly
10  established Supreme Court law. Himes, 336 F.3d at 853.

11  "The proper standard for evaluating [a] claim that appellate
12  counsel was ineffective . . .  is that enunciated in Strickland v.
13  Washington, 466 U.S. 668 (1984)]." Smith v. Robbins, 528 U.S. 259,
14  285 (2000) (citing Smith v. Murray, 477 U.S. 527, 535-36 (1986)).
15  A petitioner must first show that his appellate counsel's
16  performance fell below an objective standard of reasonableness.
17  Strickland, 466 U.S. at 688.  He must then establish he was
18  prejudiced by counsel's errors.  Id. at 694.  To establish
19  prejudice, a petitioner must demonstrate that he would have
20  prevailed on appeal absent counsel's errors.  Smith, 528 U.S. at
21  285.

22  Madsen has failed to satisfy this burden.  As explained in
23  this Report and Recommendation, none of Madsen's claims are
24  meritorious.  Thus, even if appellate counsels' failure to raise
25  them on appeal was objectively unreasonable, which this Court does
26  not find, Madsen has not established he was prejudiced by that
27  failure.  Id. (citing Strickland, 466 U.S. at 697)(the performance
28  component need not be addressed if it is easier to dispose of an

1   ineffectiveness claim on the lack of sufficient prejudice.)  Thus,

2   the state court's denial of this claim was not contrary to, nor an

3   unreasonable application of, clearly established United States

4   Supreme Court law and this Court **RECOMMENDS** that these claims be

5   **DENIED**.

6   <u>**CONCLUSION AND RECOMMENDATION**</u>

7        In sum, this Court finds that Madsen has failed to establish

8   that the California Court of Appeal and California Supreme Court

9   decisions were contrary to, or an unreasonable application of,

10  clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d).  Nor has

11  Madsen made any argument that further factual development is

12  necessary, such that an evidentiary hearing would be warranted.  <u>See</u>

13  28 U.S.C. § 2254(e)(2) (exceptions where an evidentiary hearing may

14  be appropriate).  As such, this Court **DENIES** Madsen's Request for

15  Judicial Notice of his original petition filed on August 24, 2004

16  and **RECOMMENDS** that Madsen's Petition for Writ of Habeas Corpus be

17  **DENIED** and the case dismissed with prejudice.

18       For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

19  District Court issue an Order: (1) approving and adopting this

20  Report and Recommendation, and (2) directing that Judgment be

21  entered denying the Petition.

22       **IT IS HEREBY ORDERED** that any written objections to this

23  Report must be filed with the Court and served on all parties **no**

24  **later than <u>December 4, 2007</u>**.  The document should be captioned

25  "Objections to Report and Recommendation."

26  ///

27  ///

28  ///

1    **IT IS FURTHER ORDERED** that any reply to the objections shall

2    be filed with the Court and served on all parties **no later than**

3    **December 27, 2007.** The parties are advised that failure to file

4    objections within the specified time may waive the right to raise

5    those objections on appeal of the Court's order.   See <u>Turner v.</u>

6    <u>Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

7    **IT IS SO ORDERED.**

8    DATED:   November 9, 2007

9

10   BARBARA L. MAJOR
     United States Magistrate Judge

11

12

13

14   COPY TO:

15   HONORABLE IRMA E. GONZALEZ
     UNITED STATES DISTRICT JUDGE

16
     ALL COUNSEL AND PARTIES

17

18

19

20

21

22

23

24

25

26

27

28